Director's Order #57: Occupational Medicine, Health and Fitness
Case: 4:09-cv-00010-SA-JAD Doc #: 1-3 Filed: 04/19/10 1 of 50 PageID #: 49
Page 1 of 6



# National Park Service

## DIRECTOR'S ORDER #57: OCCUPATIONAL MEDICAL STANDARDS, HEALTH AND FITNESS

**Approved:**/s/ Robert Stanton (signed original on file)
Director, National Park Service

**Effective Date:** March 1, 1999

**Sunset Date:** March 1, 2003

This Director's Order, in conjunction with Reference Manual-57—Occupational Medical Standards, Health and Fitness (RM-57), is a complete revision of the NPS "Health and Fitness Guideline, NPS-57." Release No. 1 of NPS-57 is hereby superseded; existing copies should be discarded.

### A. Background and Purpose

In 1993, the National Park Service officially determined its designated law enforcement and fire fighter positions would be managed under the provisions of enhanced annuity retirement (as authorized by 18 U.S.C. 8336(c)). The purpose of enhanced annuity retirement is to enable agencies to field a work force capable of performing the rigorous duties[1] of law enforcement and fire fighting.

Pursuant to 5 U.S.C. 3307, the mandatory separation age of 55 is applicable to designated fire fighter positions and the mandatory separation age of 57 is applicable to designated law enforcement positions. The mandatory separation age applies to employees in commissioned positions regardless of appointment or series and includes temporary, term, and seasonal appointments.

Corresponding maximum entry ages were established at age 35 for fire fighters and at age 37 for law enforcement officers to ensure employees may meet minimum qualifications for enhanced retirement. The maximum entry age applies to career and career conditional (permanent) appointments. As temporary appointments are not covered by enhanced annuity retirement, the maximum entry age does not apply to temporary, term, or seasonal appointments. However, as the mandatory separation age is applicable to all appointments, no applicant may receive a temporary, term, or seasonal appointment at or after age 57 for law enforcement positions and at or after age 55 for designated fire fighter positions.

In 1996, the Service completed a field study of the actual work of park rangers performing primarily law enforcement duties to enable the Department of the Interior

EXHIBIT "3" 000314

to establish a medical standard for those positions. The study evaluated the work of park rangers performing law enforcement under actual conditions and circumstances and developed proposed medical standards. The Department of the Interior, on July 2, 1998, approved (under authority contained in 5 CFR 339.202) the resulting Medical Standard for Commissioned Park Rangers.

The purpose of this Director's Order (as supplemented by RM-57) is to establish implementing procedures for the Medical Standards and revise policy for a physical fitness program for designated positions performing rigorous duties.

In addition to meeting requirements of law and regulation, the Medical Standards will substantially improve the safety and professionalism of employees performing law enforcement, fire fighting and other rigorous duties. The Standards are designed to ensure that employees performing law enforcement are physically able to perform that duty and that their performance does not constitute a threat to the health and well being of themselves, their fellow employees, and park visitors.

The Service will achieve its public trust responsibility to provide effective, efficient law enforcement and fire fighting services by fielding a well-trained, physically conditioned, fully capable work force. Beyond law enforcement and fire fighting services, a healthy and physically fit work force is the key to avoiding lost work time due to injury and illness.

Healthy, fit employees are far more productive and less costly than employees requiring extended medical leave and rehabilitation. For these reasons, a secondary purpose of this Director's Order is to extend and reconstitute the Service's voluntary (optional) health and fitness program for all employees, regardless of their job duties.

## B. Authority

The general authority to issue this Director's Order is contained in the National Park Service Organic Act (16 U.S.C. 1 through 4), and Part 245 of the Department of the Interior Manual. The specific authorities and requirements applicable to employees performing physically rigorous duties covered by this Director's Order are found in:

### Law

5 U.S.C. 3301. Civil service; generally

5 U.S.C. 3307. Competitive service; maximum-age entrance requirements; exceptions

### Regulation

5 CFR Part 300-Employment (General)

5 CFR Part 339- Medical Qualification Determinations

000315

29 CFR Part 1910- Occupational Health and Safety

**OPM Requirements**

OPM Operating Manual: Qualification Standards for General Schedule Positions; Section IV, Qualification Standards, and Section VI, Medical Requirements

**Departmental Policy**

DM-446 Law Enforcement

DOI Occupational Medicine Manual and Reference Manual

Medical Standards, Commissioned Park Rangers, GS-025, approved July 2, 1998

## C. Operational Policies and Procedures

**C.1** The Service will adopt appropriate medical standards and provide opportunities for designated employees to develop and maintain their physical fitness. The general goal is to establish, encourage, promote, and maintain an efficient and productive work force. The more specific goal is to ensure that all employees assigned law enforcement, fire fighting, and other physically rigorous duties are able safely to perform those duties.

**C.2** The Associate Director, Administration, and the Associate Director, Park Operations and Education,are jointly assigned functional authority for the Service's Occupational Medical Standards, Health and Fitness Program. They will promulgate and periodically revise reference manuals, training courses and materials, certifications, and other necessary materials and documents to implement and operate this program consistent with the policies, procedures and authorities contained in this Director's Order.

**C.3** The Associate Director, Administration, and the Associate Director, Park Operations and Education, will distribute and otherwise reproduce within Reference Manual-57 medical standards approved by the Department of the Interior for park ranger (protection) positions, and by the Office of Personnel Management for firefighter and other positions. Medical standards for other positions may be found in the OPM Operating Manual "Qualification Standards for General Schedule Positions" and/or Reference Manual-18, Wildland Fire Management. All standards must be applied uniformly by all managers throughout the Service.

**C.4** Servicewide consistency in the implementation and operation of this program is vital and required. Coordination and integration of the Occupational Medical Standards, Health and Fitness Program within existing functional and organizational structures must take place and be coordinated primarily at the Washington Office level by senior officials assigned by the Associate Director,

Park Operations and Education and the Associate Director, Administration.

**C.5** In order to ensure Servicewide consistency, final Service decisions regarding the medical and physical fitness of individuals to perform physically rigorous operational functions and associated training activities will be made by the Associate Director, Administration. An appeal of a Medical Standards disqualification determination must be made by an employee within 30 calendar days of receipt of notification of disqualification. The decision of the MSB will constitute the final agency decision. Pursuant to 270 DM 771.3.5B, appeals of Medical Standards disqualification determinations are processed through the procedures of the MSB and are not subject to review by the administrative grievance procedure. In cases appealed to the Medical Standards Board, the Board Chairperson will issue final Service decisions.

**C.6** An *applicant* who does not meet the OPM or Departmental medical standards established for such work may not be appointed to a position designated for enhanced law enforcement or firefighter retirement. This applies to career, career-conditional, term, and temporary appointments.

**C.7** An *employee* who does not meet the medical standards established for such work may not perform law enforcement or fire fighting work, regardless of whether the duties are primary to the position or collateral, unless the Medical Standards Board approves a request for reasonable accommodation.

**C.8** An employee may not be admitted to law enforcement or fire fighting training that requires the *regular or frequent* performance of rigorous duties unless s/he meets the medical standards established for persons performing such duties. Any employee may be admitted to training that requires only *occasional or incidental* performance of rigorous duties.

**C.9** The Medical Review Officer (who may be an employee or contractor) will make initial (pre-hire) medical qualification recommendations which will then be subject to approval by the Associate Director, Administration (or designee).

**C.10** The Medical Review Officer will make post-hire (career or temporary employees) medical qualification recommendations on a regularly scheduled basis as defined in Reference Manuals 18 and 57. The Associate Director, Administration (or designee) will issue medical qualification decisions.

**C.11** Reasonable accommodation may be considered in each instance of medical disqualification of an employee if the disqualification is the result of disability. In the event park management is or should be aware of an obvious or apparent disability, the employee's supervisor or manager should seek assistance through equal opportunity professionals and request accommodation on behalf of the employee. In the event the disability is not obvious or apparent, the employee may request such accommodation to the park superintendent or appropriate manager. The superintendent will forward the request and his/her recommendation through the Regional Director to the (WASO) Human Resources Program Manager. All requests for reasonable accommodation for disability as a result of medical disqualification must be

reviewed and approved by the Medical Standards Board *prior to implementation*.

**C.12** The Associate Director, Park Operations and Education, and Associate Director, Administration will appoint the Medical Standards Board (MSB). The MSB will consist of: 1) the Chief, Ranger Activities Division (or designee); 2) the Chief Law Enforcement Officer or the Program Manager for Wildland Fire Operations, or other appropriate risk program manager; 3) a senior Service safety manager; 4) the Medical Review Officer; and 5) the Human Resources Program Manager (or designee). The Human Resources Program Manager (or designee) will serve as the MSB Chairperson.

**C.13** The MSB Chairperson will be the deciding official in reasonable accommodation determinations and will be the spokesperson for the MSB before any third party.

**C.14** The Service will use the Physical Efficiency Battery (PEB) of measurements developed at the Federal Law Enforcement Training Center (FLETC), as the mandatory physical fitness test for initial appointment to a position whose duties are primarily law enforcement. The Service will use the applicable Work Capacity Test Series as physical fitness test for appointment to designated fire fighting positions.

**C.15** The PEB and the Work Capacity Test Series will be threshold tests and baseline fitness measures. The Service will generally not place persons failing to pass the PEB or the Work Capacity Test Series in law enforcement or firefighter training that requires the regular performance of rigorous duties.

**C.16** For current employees performing law enforcement and/or fire fighting duties, the PEB and the Work Capacity Test Series will serve to identify individuals who are potentially at high risk of injury or disease by continuing to perform the rigorous duties of their position. By administering the PEB and the Work Capacity Test Series, the Service will identify employees whose physical condition may pose a potential health or safety risk to themselves, to co-workers, or to the public. The Service may require these employees to reduce or eliminate that potential risk through mandatory participation in a health and fitness program focused on positive improvement and achieving fitness results.

**C.17** All parks and units employing Park Rangers or other employees assigned law enforcement or fire fighting duties may provide each such employee up to 3 hours of mandatory-participation physical fitness exercise time per work-week. Pursuant to DO-18, those wildland firefighters whose fulltime duties are 100 percent arduous duty-related (such as helitack, hotshot, engine, prescribed fire, smokejumper crews) will normally be provided 1 hour per day for fitness training. Parks and units may provide or make available appropriate and safe facilities and equipment to enable each mandatory-participation employee to maintain adequate physical conditioning to perform safely the rigorous duties assigned. Park managers may develop on-site fitness facilities and/or provide for employee participation in fitness facilities within a reasonable distance to the park or office.

000318

Attachment A

# MEDICAL STANDARDS BRIEFINGS – QUESTIONS AND ANSWERS

Over the last several months, members of the WASO Human Resources Office, Ranger Activities Division and the Atlanta Public Health Service have given briefings on the Medical Standards Program at locations throughout the Service. At many of these briefings, some of the same questions were asked. The questions and answers listed below are as a result of the concerns raised at those briefings.

## Validity of Medical Standards

1. Are the medical standards for Park Rangers appropriate? That is, do the standards accurately reflect the medical condition necessary to do the work assigned to Park Rangers?

   Prior to implementation, the standards were developed and validated by a group of subject matter experts from the Office of Personnel Management, the Departmental Office of Risk Management, and Federal Occupational Health. They, along with representatives at the field and headquarters level of the Service, studied the work of Park Rangers and developed the standards. The standards were reviewed by the OPM and the Department of the Interior and were found to be appropriate and valid.

2. Are the medical standards for Park Rangers more stringent than standards for law enforcement positions in other agencies?

   In general, some agencies and some positions have more and less stringent standards. Our standards stand somewhat in the middle ground. In some respects, our standards are more stringent. Our standards reflect the difficult terrain and work conditions that Park Rangers face everyday. In many situations, Park Rangers work in greater isolation than other law enforcement professionals do. The medical standards were developed to reflect the medical condition necessary to work under those conditions.

3. Can the medical standards for Park Rangers be revised?

   The Department of the Interior may periodically review and revise medical standards for Park Rangers to ensure the standards accurately reflect the medical condition necessary to perform the duties of the position. The Service intends to review the standards on a regular basis, every two or more years, to re-validate the standards and recommend any changes. Any recommended change would need to be specifically justified. Only the Department or the Office of Personnel Management may approve changes.

4. Are medical standards for Park Rangers rigidly applied?

   Medical standards are rigidly applied without exception to applicants with no prior work history in law enforcement in the National Park Service. For current employees and applicants with a prior work history in law enforcement in the Service, a work history may be considered as a part of the medical evaluation.

5. Are many current Park Rangers expected to not meet medical standards?

The experience of Federal Occupational Health in performing medical evaluations suggests that the typical rate of failure to meet medical standards for law enforcement professionals within the Federal Government is about 1 to 2 %. We expect the vast majority of Park Rangers to meet medical standards.

## Prior Work History

6. May prior law enforcement work experience be considered in making medical evaluations?

   Prior work experience in the National Park Service performing law enforcement duties may be considered in medical evaluation. The experience may be considered for either an employee or a returning applicant for temporary (seasonal) appointment. Experience in other law enforcement agencies is not considered, as the experience needs to be specific to conditions typically found in National Parks.

7. How does an employee/applicant have prior service considered?

   In order for the Medical Review Officer to consider successful previous experience in law enforcement, the employee/applicant must submit a brief work history with a minimum of three months seasonal work in the past calendar year. It should be verified by the employee/applicant's supervisor and the park human resources officer and included within the medical examination paperwork. If no evidence of prior work history is included, the Medical Review Officer will assume there is no previous work history.

8. What should the work history include?

   The law enforcement work history should include the length of time working as a Park Ranger who was assigned law enforcement duties and maintained a law enforcement commission, the specific parks where the work was performed and the locations within those parks where work was performed, the dates the work was performed, a full description of duties successfully performed, the environment in which those duties were performed, verification of the information by the park chief ranger and human resources manager.

## Communication of Medical Determinations

9. How are recommendations of the Medical Review Officer communicated to parks?

   All Medical Review Forms showing whether additional information is needed, additional tests are needed or there is a Significant Medical Finding, PHS will fax the information directly to servicing human resources offices or designated points of contact for parks. A copy of all Medical Review Forms except those not requiring further follow-up will be sent to the Chief, Staffing and Compensation in Washington for status tracking and for decision making purposes when this is needed.

10. If a finding is other than no significant medical finding (employee meets medical standards), what action should be taken?

    In the event of a finding of significant medical findings, the employee should not be

Case: 1:10-cv-00040-SA-JAD Doc #: 4-3 Filed: 04/19/10 8 of 50 PageID #: 47

assigned any hazardous or rigorous law enforcement duties. In the event of a finding of final decision cannot be made, the employee may continue to be assigned hazardous or rigorous law enforcement duties at the discretion of the supervisor and/or park management based upon the issues not yet resolved.

## Medical History

11. Should applicant/employees provide medical documentation of any past or current medical condition with them to the physical examination?

   Applicants/employees should be instructed to provide medical documentation with them to the examination with the understanding that this information will be included in the examination results for review by the Medical Review Officer. The documentation should include the diagnosis, treatment, outcome, and prognosis for recovery for any surgery or broken bones for the period three years prior to the examination.

## Vision Standard

12. Does an applicant/employee whose examination results indicate uncorrected vision that does not strictly meet medical standards

   If the applicant/employee submits a verified law enforcement work history in the NPS as stated above and has a examination result of uncorrected vision of 20/200 that is corrected to 20/20, the Medical Review Officer MAY recommend that the Human Resources Program Manager waive the standard based on prior successful work performance. If the vision is greater than 20/200, the applicant/employee will receive a finding of significant medical finding, but will have the opportunity to provide additional information and documentation of their ability to successfully perform rigorous law enforcement duties.

13. How soon may an employee return to work after surgery to correct or improve vision?

   As with any surgery, an employee should be examined and evaluation by the Medical Review Officer prior to returning to work. Depending upon the type of surgery performed, an employee may return to unrestricted duties upon recovery.

## Hearing Standard

14. Will the use of a hearing aid enable a current employee or applicant to meet medical standards for hearing? Is the use of a hearing aid a reasonable accommodation for hearing loss?

   A hearing aid may not be used by an applicant to meet minimum standards but may be used to enhance hearing above the minimum levels. As with all medical evaluations, each situation is reviewed on an individual basis. However, a hearing aid is a mechanical device that may be displaced from the ear or may be subject to failure. In order to respond to the critical incidents that occur in law enforcement, Park Rangers must have sufficient hearing without the use of a hearing aid. Additionally, hearing aids do not allow an individual to pick out certain sounds against a background of noise. The likelihood is that an individual using a hearing aid is far more likely to be unsafe to his/herself or to

others. Thus, generally a hearing aid may not be a reasonable accommodation of a Park Ranger for purposes of meeting the medical standard for hearing.

## Stress Tests

15. Are stress tests still being conducted? Why or why not?

Stress Treadmill EKG tests are no longer being conducted. While the Stress Treadmill EKG has value as a diagnostic test, the frequency of both false positive and false negative test examination results have limited value in determining medical evaluations for medical standards.

## Psychological Examinations

16. Are psychological examinations conducted?

Psychological examinations are not conducted as a part of preplacement or periodic examinations. Psychological examinations may be conducted for return to duty examinations and fitness for duty examinations if warranted.

## Criminal Investigators

17. Are there medical standards for criminal investigators in the National Park Service?

Medical Standards have been written and validated for the Criminal Investigator occupation by the Office of Personnel Management (OPM). These general medical standards may be used by any Federal agency having this occupation. There are no medical standards that have been written specifically for this position in the National Park Service because we have limited numbers of employees in this occupation. We will, however, review the general standards with the OPM and the PHS to determine whether or not these standards are applicable to this position within the NPS. Given that the circumstances and physical setting which Criminal Investigators work in is similar to that of Park Rangers, it is likely that the Criminal Investigator medical standards will be similar to the standards for Park Rangers..

## Implementation

18. When are parks to implement medical standards for current employees?

Upon issuance of RM-57, parks were instructed to begin implementation of medical standards for all employees as of the effective date of the Director's Order. Any park, which has not begun to implement medical standards, must do so immediately. This includes both temporary/seasonal and permanent employment.

## Program Funding

19. Who pays for medical examinations and evaluations?

For medical examinations for Park Rangers performing law enforcement duties, initial examinations and evaluations are conducted through a Servicewide contract with the

Case: 1:10-cv-00040-SA-JAD Doc #: 4-3 Filed: 04/19/10 10 of 50 PageID #: 149

Public Health Service which is part of Federal Occupational Health and funding through a central, Servicewide account. However, in certain circumstances, additional testing is the responsibility of the employee and should be paid through his/her medical insurance. Please review the following situations:

- o If a specific test was not completed at the initial physical testing, then the employee returns to the original place of testing and requests that the test be completed. In this case, charges would be paid by the basic funding account.

- o If the Medical Review Officer recommends further testing because a final decision cannot be made until more information is received, it is the responsibility of the employee to seek this further testing and cover these expenses with his/her personal medical insurance.

- o If the MRO recommends additional information for applicants, the responsibility to provide that information and/or provide the results of additional medical tests is the responsibility of the applicant. Any expense incurred will be paid by the applicant.

- o Additionally, the Servicewide contract provides funding for fitness for duty examinations as ordered by the Service and for return to duty examinations after injury/incapacitation for duty.

# THE UNITED STATES DEPARTMENT OF INTERIOR
## LAW ENFORCEMENT

# MEDICAL STANDARDS

## THESE STANDARDS ARE APPLICABLE TO THE FOLLOWING POSITIONS:

## NATIONAL PARK SERVICE

### PARK RANGERS (PROTECTION)  (Personnel Series 025)

Under 5 CFR Part 339 Medical Qualifications Determinations, medical standards may be established for positions with duties that are arduous or hazardous in nature.  The medical standards described in this section are required because of the arduous and hazardous occupational, functional and environmental requirements of the positions covered by these standards. The medical standards are provided to aid the Agency medical reviewing physician and the Department of Interior officials in determining what medical problems may hinder the individual's ability to satisfactorily perform their full range of essential duties without undue risk to himself/herself or others.  They are also to be used to ensure consistency and uniformity in the application of these standards.

**_Any disease, condition or impairment, not specifically listed in these medical standards, which interferes with the safe, efficient and expected performance of the essential duties and responsibilities may also constitute grounds for medical disqualification._**

These standards will be guided by the considerations set forth in 5 CFR Part 339, Medical Qualifications Determinations.  Listed below are examples of medical conditions and/or physical impairments that may be disqualifying.  Individualized assessments will be made on a case-by-case basis to determine an individual's ability to meet the performance related requirements of positions covered by these standards. Final consideration and medical determination may require additional medical information and/or testing that is not routinely required during either the pre-placement or periodic medical examination.

An applicant that is unable to obtain a drivers license for any medical reason will not be considered for these Department of Interior law enforcement positions until such time that the condition is resolved and a drivers license has been issued.  Regardless of the re-issuance of a driver's license the applicant must still meet the medical standards outlined in this document.

These medical standards are intended to serve as a general guideline for the safe placement into and the continued working in hazardous and arduous job positions within the Department of Interior law enforcement.  Each of the medical standards listed in this document are subject to the clinical interpretation of the condition by the Agency medical reviewing physician who will incorporate his/her knowledge of the job requirements and environmental conditions in which employees must work.

Revised 3/23/98

000325

## VISION STANDARDS

Any disease or condition which interferes with a person's vision may be considered disqualifying. Cases will be reviewed on a case-by-case basis.

1.   Uncorrected distant vision must be equal to or better than 20/100 in each eye. (The use of Soft Contact Lenses [SCL] may be considered a reasonable accommodation for candidates who have been successful SCL wearers for at least one year and who wear SCL on duty at all times.)
2.   Binocular distant vision must be correctable to 20/20.
3.   Monocular vision is disqualifying.
4.   Depth Perception must be equal to or better than 70 seconds of arc.
5.   Peripheral Vision must be normal.
6.   Color vision must be sufficient to pass the Ishihara 15 plate series color vision test or the Farnsworth D-15 color vision test. X-Chrome lenses are not acceptable as a means for correcting color deficiencies.
7.   Orthokeratology is acceptable as long as individuals wear their lenses while on duty at all times and meet the above visual acuity requirements for corrected vision. (Orthokeratology involves the use of special hard contact lenses that "mold" the shape of the cornea to reduce myopia. The individual may wear the lenses for a period of time, then remove them to enjoy a period of good vision without the lenses. The lenses are put back into the eyes 1-3 days later when the individuals vision deteriorates.)

## CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

Ophthalmologic conditions which are particularly susceptible to environmental exposures such as sunlight, dusts, fumes, various volatile compounds may cause an applicant to be disqualified.

1.   **REFRACTIVE SURGICAL PROCEDURES (i.e., Radial Keratotomy, Photorefractive surgery [laser], Keratoplasty, etc.)**
     These operative procedures are considered acceptable provided that the individual's vision meets the above standards post-operatively and the operation occurred **AT LEAST ONE YEAR** before application. The individual must be free of post-operative complications. The results of an eye examination by a board-certified Ophthalmologist will be required to insure that vision is not impeded due to post-operative complications such as infection, glare, and contrast-sensitivity.

2.   **CHRONIC CONJUNCTIVITIS**
     Due to the possible visual impairment and/or increased susceptibility to environmental exposures which could interfere with the job performance, this condition may result in a medical disqualification.

2

3.   **PTERYGIUM**
This condition is generally disqualifying if vision is impaired by the growth.

4.   **CORNEAL ABRASIONS**
Because this condition may interfere with visual acuity it is generally disqualifying. The degree of impairment must be determined by an Ophthalmologist.

5.   **CORNEAL DYSTROPHY**
This condition is generally disqualifying if the individual can not meet the outlined Department of Interior law enforcement vision standards. Varying degrees of this condition could sufficiently impair the visual acuity which may result in a medical disqualification.

6.   **CORNEAL SCARS**
This condition is generally disqualifying if the individual can not meet the Department of Interior law enforcement vision standards. Varying degrees of this condition could sufficiently impair the visual acuity which may result in a medical disqualification.

7.   **CORNEAL ULCERS**
This condition is generally disqualifying since essential duties of the position could further exacerbate the condition, in addition to the condition causing impairments of the visual acuity. This condition must be treated and cleared by an Ophthalmologist before any further consideration is given to the applicant.

8.   **KERATITIS**
Any visual impairment associated with keratitis that is likely to interfere with job performance is generally disqualifying.

9.   **KERATOCONUS**
This condition causes a cone shape to the cornea and results in major changes in the refracting power of the eye which necessitates frequent changes in the eyeglass prescriptions. If the visual acuity is currently corrected to the above standards then the applicant would be considered acceptable.

10.   **RETINAL DETACHMENT**
This condition is generally disqualifying due to the serious visual obstruction.

11.   **RETINITIS PIGMENTOSA**

12.   **LENS OPACITIES**
This condition could be considered disqualifying if the individual can not meet the Department of Interior law enforcement vision standards.

13.   **GLAUCOMA**
This condition, if confirmed by an ophthalmologist, is generally disqualifying if there is any impairment of peripheral vision.

3

000327

14. **NIGHT BLINDNESS**

## THE HEARING STANDARDS

Any disease or condition which interferes with the ability to hear may be considered disqualifying. Cases will be reviewed on a case-by-case basis.

1. **In the frequency range from 500 - 2,000 hertz (Hz), the deficit should not exceed 30 decibels in either ear.**
2. **At 3,000 Hz the deficit should not exceed 40 decibels in either ear.**
3. **HEARING AIDS: The use of any hearing aid to comply with the medical standards is unacceptable.**

A pure tone audiogram must be performed in an approved sound proof hearing booth that conforms to the American National Standards Institute (ANSI) standards, without hearing aids. The person must be binaural (have hearing in both ears). A whisper test is not acceptable. Additional testing may be required to render a final medical opinion, including, but not limited to a second audiogram separated by a noise-free period of from 15-40 hours, an Otolaryngologist's examination, testing for speech reception threshold and word discrimination (at a presentation level of 50db), and the Hearing In Noise Test (HINT Study).

## OTOLOGICAL CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. **MENIERE S DISEASE**
2. **VESTIBULAR NEURONITIS**
3. **VERTIGO & PAROXYSMAL POSITIONAL VERTIGO**
4. **ACOUSTIC NEUROMA**
5. **WEGENER S GRANULOMATOSIS**
6. **OTOSCLEROSIS**

\* Any other disease or defect of the ear which adversely affects hearing or equilibrium and which potentially interferes with the safe and efficient job performance is generally disqualifying.

## HEAD, NOSE, MOUTH, THROAT AND NECK STANDARD

A general examination of the head and neck should be performed during the physical examination. Attention should be given to any skull deformities, loss of bony substance or any evidence of past surgery. Cases will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1. **MUTISM/ APHONIA (INABILITY TO SPEAK)**
2. **ANOSMIA**
3. **ARTIFICIAL LARYNX OR ESOPHAGEAL SPEECH**
4. **FACIAL DEFORMITIES**
5. **TEMPOROMANDIBULAR JOINT SYNDROME (MODERATE TO SEVERE CASES)**
6. **NASAL POLYPS THAT SIGNIFICANTLY OBSTRUCT BREATHING**
7. **RESTRICTED RANGE OF MOTION IN THE NECK**
8. **NECK MASSES, LYMPHADENOPATHY OR TRACHEOSTOMY**

* Any other chronic disease or condition which significantly interferes with speech or breathing and bears the potential to render the person suddenly incapacitated is generally disqualifying.

## THE PERIPHERAL VASCULAR SYSTEM STANDARD

Any condition which significantly interferes with peripheral vascular function may be considered disqualifying. The peripheral vascular system involves the veins and arteries of the legs and arms. Cases will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1. **CHRONIC VENOUS INSUFFICIENCY**
2. **DEEP VEIN THROMBOSIS**
3. **CHRONIC THROMBOPHLEBITIS**

## CARDIOVASCULAR SYSTEM STANDARD

Any disease or condition which interferes with cardiac function may be considered disqualifying. Cases will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

000329

1. **PACEMAKERS or PROSTHETIC VALVES** are generally disqualifying. Any other condition or post-surgical management that requires the use of Coumadin or other anti-coagulants is generally disqualifying.

2. **CORONARY ARTERY DISEASE.**

3. **HYPERTENSION** that requires the use of any medication to stabilize the blood pressure may be disqualifying. Systolic blood pressure exceeding 150 and/or diastolic blood pressure exceeding 90 mm Hg may be disqualifying. Confirmation of hypertension will require at least three (3) serial readings of blood pressure. Serial readings must include at least three (3) blood pressure readings taken on different days and should include readings in both arms in a standing, sitting, and recumbent position. Additional testing may be required to render a final medical opinion, including, but not limited to a maximal, symptom-limited exercise stress EKG, dilated funduscopic exam of the eye to detect hypertensive retinopathy, and a cardiologist evaluation to determine whether there exists any contraindication for vigorous intensity physical exercise. Individuals on medication will have to demonstrate the absence of orthostatic hypotension with blood pressure measurements in the sitting, standing, and lying positions. Anti-hypertensive medication will be evaluated to ensure that safe and efficient job performance will not be adversely affected.

4. **LEFT BUNDLE BRANCH BLOCK.**

5. **MYOCARDITIS/ ENDOCARDITIS/ PERICARDITIS** (Active or recently resolved cases). A past history of these diseases may require additional testing to determine the current capabilities.

6. History of **MYOCARDIAL INFARCTION**.

7. A history of **CARDIAC SURGERY** (depending on the procedure and when it was performed).

8. **VALVULAR HEART DISEASE** such as mitral valve stenosis, mitral valve regurgitation, aortic stenosis, mitral valve prolapse, etc.

9. **DYSRHYTHMIAS**: such as ventricular tachycardia or fibrillation, Wolff-Parkinson-White syndrome, Paroxysmal Atrial Tachycardia with or without block.

10. **CEREBROVASCULAR ACCIDENT** or **TRANSIENT ISCHEMIC ATTACKS**.

11. **PULMONARY EMBOLISM** (within the past six months or if there is a recurrent history or use of anticoagulants.

12. **ANGINA PECTORIS** or chest pain of unknown etiology.

13. **CARDIOMYOPATHY** from any cause.

14. **CONGESTIVE HEART FAILURE**

15. **MARFAN'S SYNDROME**

16. **CONGENITAL ANOMALIES (case-by-case review of clinical presentation)**

## CHEST AND RESPIRATORY SYSTEM STANDARD

Any disease or condition which interferes with respiratory function may be considered disqualifying. Cases will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1. **FORCED VITAL CAPACITY (FVC) AND/OR FORCED EXPIRATORY VOLUME AT ONE SECOND (FEV1) THAT IS LESS THAN 70% OF THE EXPECTED VALUE.**

2. **THE FEV1/FVC RATIO SHOULD NOT REFLECT EVIDENCE OF A SIGNIFICANT OBSTRUCTIVE OR RESTRICTIVE DISORDER.**

3. **ASTHMA** currently controlled on any medication is generally disqualifying. A history of asthma after of the age of 12 years must be considered on a case-by-case basis. A person may be requested to submit to take a Methacholine challenge test, exercise stress treadmill test, or other diagnostic assessment prior to making final recommendations.

4. **ACTIVE PULMONARY TUBERCULOSIS (TB)**: A history of confirmed TB that has been treated for longer than 6 months is acceptable provided that documentation supports the treatment history. Additionally, diagnostic studies may be required following the case evaluation. Evidence of significant lung destruction in fully treated cases will be evaluated on a case-by-case basis. Any case of **active TB** would delay medical qualification until a sufficient period of time has passed to render the person non-communicable and documentation must be provided to show evidence of medical regimen compliance.

5. **HISTORY OF CHRONIC BRONCHITIS ASSOCIATED WITH DECREASED PFT RESULTS.**

6. **LUNG ABSCESS**

7. **SPONTANEOUS PNEUMOTHORAX (if recurrent)**

8. **EMPHYSEMA**

9. **SARCOIDOSIS** (if associated with an impaired pulmonary function)

10. **PULMONARY EMBOLISM**

11. **PULMONARY INFARCTION**

12. **TUMORS OF THE LUNG**

13. **PNEUMONECTOMY** ( if FEV1 less than 70%)

\* Respiratory disorders not listed above will be reviewed on a case-by-case basis and may require the evaluation by a Pulmonologist.

## GASTROINTESTINAL SYSTEM STANDARD

The gastrointestinal tract (GI) should be considered normal from the mouth to the anus by the examining physician. Any disorder of the GI tract capable of rendering the applicant suddenly incapacitated or incapable of sustaining attention to required tasks, i.e., chronic diarrhea, may be considered disqualifying. Cases will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1. **ACUTE AND CHRONIC ACTIVE HEPATITIS**

2. **CROHN'S DISEASE / ULCERATIVE COLITIS / REGIONAL ENTERITIS or IRRITABLE BOWEL SYNDROME** (Control of these conditions with surgical and/or medication treatments will be reviewed on a case-by-case basis.)

3. **COLOSTOMIES**

4. **ILEITIS** (recurrent or chronic)

5. **CHOLELITHIASIS** (symptomatic or asymptotic)

6. **CHOLECYSTITIS** (chronic or recurring)

7. **DIVERTICULITIS** (symptomatic)

8. **DYSPHAGIA** from any cause. Control/severity/treatment of these conditions will be reviewed on a case-by-case basis.

9. **CIRRHOSIS OF THE LIVER** (depending upon the degree of severity and the etiology)

10.   **INTESTINAL OBSTRUCTION** from any cause

11.   **PANCREATITIS**

12.   **AN UNTREATED INGUINAL, INCISIONAL OR VENTRAL HERNIA.**

The following clinical scenarios and all other gastrointestinal conditions will be considered on a case by case basis:

* A history of bowel resection is generally disqualifying if there is any evidence of recurrent pain, hemorrhage or any dietary restrictions that might interfere with the performance of the duties and responsibilities.

* A history of gastric resection is generally disqualifying if there is any evidence (historical or physical) of pain, hemorrhage, fainting episodes or dietary restrictions that might interfere with the performance of the job.

* A history of a symptomatic hiatal hernia resulting in chest pain, gastrointestinal hemorrhage (occult or massive), or respiratory symptoms. The complication of gastroesophageal reflux controlled on antacids will generally be considered acceptable.

## GENITOURINARY AND REPRODUCTIVE SYSTEM STANDARD

In general, any dysfunction of the genitourinary or reproductive system that has the capability of interfering with the required tasks or rendering the person suddenly incapacitated may be considered disqualifying. Any functional disorders rendering the individual incapable of sustained attention to work tasks, i.e., urinary frequency and/or significant discomfort secondary to such disorders, are generally disqualifying. Cases will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1.   **POLYCYSTIC KIDNEY DISEASE**
2.   **ACUTE or CHRONIC RENAL FAILURE**
3.   **NEPHROTIC SYNDROME**
4.   **SYMPTOMATIC URINARY CALCULI**
5.   **NEUROGENIC BLADDER**
6.   **BERGER'S DISEASE**
7.   **HISTORY OF RENAL VEIN THROMBOSIS**
8.   **UNCORRECTED OBSTRUCTIVE UROPATHIES**
9.   **RENAL TOXICITY**

**THE CONDITION OF PREGNANCY**

000333      9

A female currently pregnant in her first or second trimester would generally be requested to provide medical documentation from her treating physician in order for the agency to better determine her individual ability to participate in the FLETC training course. A female currently pregnant in her third trimester would generally be requested to postpone the FLETC training course until successful parturition and adequate time for convalescence.

## ENDOCRINE AND METABOLIC SYSTEMS STANDARD

Any excess or deficiency in hormonal production can produce metabolic disturbances affecting weight, stress adaptation, energy production, and a variety of symptoms or pathology such as elevated blood pressure, weakness, fatigue and collapse. Any condition affecting normal hormonal/metabolic functioning and response that is likely to adversely affect safe and efficient job performance is generally disqualifying. Cases will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1. **ADRENAL DYSFUNCTION (In the form of Addison's Disease or Cushing's Syndrome).**

2. **THYROID DISEASE** (uncontrolled or associated with complications). Hypothyroidism adequately controlled by hormone replacement may be considered acceptable.

3. **PITUITARY DYSFUNCTION**

4. **INSULIN DEPENDENT DIABETES MELLITUS**

5. **HYPERGLYCEMIA** will require additional tests including but not limited to a glycohemoglobin (or hemoglobin $A_1C$), fasting glucose, and a 3 hour glucose tolerance test before a final medical determination.

6. **DIABETES INSIPITUS**

## MUSCULOSKELETAL SYSTEM STANDARD

Any condition that adversely impacts on an individuals movement, agility, flexibility, strength, dexterity, coordination or the ability to accelerate, decelerate and change directions efficiently may be considered disqualifying. Cases will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1. **ARTHRITIS (ANY ETIOLOGY)** if there is limited joint motion and/or pain.

2. **AMPUTATIONS** of more than one digit if it directly affects the ability to grip and efficiently handle weapons.

3. **AMPUTATIONS OF AN EXTREMITY**: Any loss of an upper or lower extremity. Less than five (5) digits on each hand will be evaluated on a case-by-case basis.

4. **ANKYLOSING SPONDYLITIS.**

5. **SCOLIOSIS**, if the lateral curve is 20 degrees of more

6. **MUSCULAR DYSTROPHY**

7. **LUMBOSACRAL INSTABILITY**: pain or limitations of flexibility and strength causing an inability to stand, bend, stoop, carry heavy objects or sit for long periods of time.

8. **DEGENERATIVE DISK DISEASE**

9. **FIXED LORDOSIS OR KYPHOSIS** which limits mobility and skeletal strength.

10. **FRACTURES** may require orthopedic evaluation to determine whether functional limitations currently exist. A recent fracture with current immobilization (such as casting, bracing, etc.) of a limb that prevents the performance of the full range of law enforcement duties will require documentation from the treating physician that immobilization is no longer required and that no physical limitations are present.

11. **SPINA BIFIDA**

12. **SCIATICA OR OTHER NEUROPATHIES**

13. **CHRONIC LOW BACK PAIN** (by medical history) without demonstrable pathology may be considered disqualifying. Each case will be reviewed in context to the original history of the injury (or whatever the etiology), the response to therapeutic regimes, frequency of recurrence, exacerbating factors, and lengths of disability associated with the recurrences combined with the current clinical presentation. Any other documentation submitted or requested will be considered before a medical opinion is generated.

14. A history of a **CHRONIC SPRAIN OR STRAIN OF THE NECK** limiting mobility or causing recurring cephalgia (headaches) may be disqualifying.

15. Any **PROSTHETIC DEVICE** will be reviewed on a case-by-case basis.

000335

11

16. Evidence of a **CERVICAL RIB, SUBLUXATION, TORTICOLLIS, SYMPTOMATIC THORACIC OUTLET SYNDROME** or a **BRACHIAL CLEFT CYST**

17. Any evidence of a **CERVICAL NEUROPATHY** including numbness, tingling or loss of motor strength in the upper extremities may be disqualifying.

18. Any medical condition, congenital or acquired, which would interfere with a person's agility, dexterity, the lifting of heavy objects or the ability to perform the full range of law enforcement duties may be disqualifying.

19. A condition may be disqualifying if there is evidence that the general body symmetry may directly interfere with the safe utilization of issued standard and specialty equipment, including but not limited to handguns, shot guns, handcuffs, motor vehicles, etc.

## HEMATOPOETIC SYSTEM STANDARD

Any hematopoetic disease or condition which interferes with the expected performance of these jobs is generally disqualifying. Cases will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1. **ANEMIA-- Generally considered as a:**
**HEMATOCRIT OF LESS THAN 39% AND A HEMOGLOBIN OF LESS THAN 13.6 gm/dl FOR MALES**
**HEMATOCRIT OF LESS THAN 33% AND A HEMOGLOBIN OF 12 gm/dl FOR FEMALES**
(If anemia does exist but physical performance levels and pulmonary function are normal than this condition may be acceptable.)
2. **INHERITED CLOTTING DISORDERS (ex. HEMOPHILIA)** are generally disqualifying
3. **CHRONIC LYMPHANGITIS**
4. **THROMBOCYTOPENIA OR CLOTTING DISORDER**
5. **SICKLE CELL ANEMIA**
6. **SPLENOMEGALY**

## CENTRAL AND PERIPHERAL NERVOUS SYSTEMS STANDARD

Any disease or condition which interferes with the central or peripheral nervous system function may be considered disqualifying. Cases will be reviewed on a case-by-case basis.

000336

1.  Cerebral and cerebellar functions must be normal.

2.  The peripheral nervous system and all reflexes should be acceptable.

3.  An individual with a history of seizures currently controlled on medication(s) is generally disqualified. Re-evaluation of an individual is subject to the seizure policy outlined below.

### SEIZURE POLICY

A history of seizures requires an individual to meet the following criteria before further medical consideration:

1.  The individual must present the results of an awake and sleeping electroencephalogram (EEG) following an acceptable, non-medicated, seizure-free period of time. The current EEG must be free of epileptiform abnormalities.

An acceptable period of time will be defined by the prevailing scientific standards of medicine, a review of the current medical literature and the opinions of the individual's private Neurologist and, if necessary, a Neurologist selected by the Agency.

2.  The medical history and/or documentation regarding the etiology of the seizure disorder must be submitted from the private physician(s), if available.

3.  The agency may require a complete neuropsychological evaluation prior to further consideration of an individual.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1.  ATAXIA
2.  CHOREOATHETOSIS
3.  EPILEPSY  (See the seizure policy above)
4.  HUNTINGTON'S CHOREA
5.  MULTIPLE SCLEROSIS
6.  MUSCULAR DYSTROPHY
7.  NARCOLEPSY
8.  NEUROFIBROMATOSIS
9.  PARKINSON S DISEASE
10. CEREBROVASCULAR ACCIDENT (STROKE)
11. TRANSIENT ISCHEMIC ATTACKS
12. SENSORY DYSFUNCTION (smell, touch, taste).
13. MIGRAINE CEPHALGIA

000337

\* Any neurological disease or disorder that is not listed above shall be reviewed on a case-by-case basis.

## INFECTIOUS DISEASE POLICY
## IMMUNE SYSTEM / ALLERGIC DISORDERS STANDARDS

Any communicable disease which can directly affect the occupational job performance and/or directly threaten the health and safety of others is generally disqualifying. Cases will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1. **HEREDITARY ANGIOEDEMA**
2. **GOODPASTURES' SYNDROME**
3. **AUTOIMMUNE HEMOLYTIC ANEMIA**
4. **VASCULITIS**
5. **HASHIMOTO'S THYROIDITIS**
6. **MYASTHENIA GRAVIS**
7. **SYSTEMIC LUPUS ERYTHEMATOSUS**

**SPECIAL CONCERNS:**

**HIV / AIDS:** In general an applicant that **VOLUNTEERS** information regarding a positive HIV status or AIDS may be considered medically ineligible. The applicant has the opportunity to **voluntarily** submit additional information supporting his/her HIV status at his or her expense in order for the agency to better determine their eligibility.

**HEPATITIS:** A history of chronic or acute active hepatitis B or hepatitis C is generally disqualifying. A finding of unexplained elevated liver enzymes may require additional diagnostic studies before a final medical recommendation is rendered. Additional medical information will be obtained in order for the agency to better determine their eligibility.

**TUBERCULOSIS:** A history of TB that has been appropriately treated for longer than 6 months is acceptable provided that documentation supports the treatment history and the person has a current normal chest x-ray. A person with a positive PPD or Mantoux skin test will be required to have a Chest X-ray and, if indicated, a sputum culture.

## PSYCHIATRIC DISORDERS STANDARD

Any disorder which affects normal perceptual judgment and safe and acceptable behavior or, if there is evidence of serious mental impairment, is generally disqualifying. Cases will be reviewed on a case-by-case basis.

**SPECIFIC PSYCHIATRIC DISORDERS THAT MAY BE DISQUALIFYING INCLUDE BUT ARE NOT LIMITED TO THE FOLLOWING EXAMPLES.** All diagnosis must be consistent with the diagnostic criteria as established by the <u>Diagnostic</u> <u>and</u> <u>Statistical</u> <u>Manual</u> of <u>Mental</u> <u>Disorders, Fourth Edition</u> (DSM-IV), or any subsequent revisions. Any psychiatric illness not listed here shall be reviewed on a case-by-case basis.

**AXIS I DISORDERS:**

> **DELIRIUM, DEMENTIA, AND AMNESTIC AND OTHER COGNTIVE DISORDERS**
>
> **MAJOR DEPRESSION**
>
> **MANIC-DEPRESSIVE DISORDER (BI-POLAR)**

**DISSOCIATIVE DISORDERS**

**KLEPTOMANIA**

**PANIC DISORDER AND OTHER ANXIETY DISORDERS** (depending upon etiology, duration and severity of clinical expression)

**PATHOLOGICAL GAMBLING**

**PYROMANIA**

**SCHIZOPHRENIA AND OTHER PSYCHOTIC DISORDERS** (Exceptions may be made in cases of a single episode of schizophrenic reactions associated with an acute illness capable of causing such reaction.)

**SEXUAL AND GENDER IDENTITY DISORDERS** (Areas of concern include: transsexualism, fetishism, pedophilia, sexual sado-masochism, voyeurism and transvestic fetishism)

**AXIS II DISORDERS**

> **NARCISSISTIC PERSONALITY DISORDER**
>
> **ANTISOCIAL PERSONALITY DISORDER**
>
> **DEPENDENT PERSONALITY DISORDER**

000339

**PARANOID PERSONALITY DISORDER**

**SCHIZOID PERSONALITY DISORDER**

**ORGANIC BRAIN SYNDROME**

## MEDICATION STANDARD

All medication requirements, including psychotropic medication, will be evaluated to ensure that safe and efficient job performance will not be adversely affected. Cases will be reviewed on a case-by-case basis. Each of the following considerations will enter the medical recommendations:

1. **MEDICATION(S)  (Type and dosage requirements)**
2. **POTENTIAL DRUG SIDE EFFECTS**
3. **DRUG-DRUG INTERACTIONS**
4. **ADVERSE DRUG REACTIONS**
5. **DRUG TOXICITY AND ANY MEDICAL COMPLICATIONS ASSOCIATED WITH LONG TERM DRUG USE**
6. **DRUG-ENVIRONMENTAL INTERACTIONS**
7. **DRUG-FOOD INTERACTIONS**
8. **HISTORY OF PATIENT COMPLIANCE**

Medications such as narcotics, sedative hypnotics, barbituates, amphetamines, or any drug with the potential for addiction, that is taken for extended periods of time (usually beyond 10 days) or is prescribed for a persistent or recurring underlying condition would generally be considered disqualifying.

## SPECIAL SUBJECT: ANABOLIC STEROID USE

Any person currently using anabolic steroids may be disqualified.  Anabolic steroids were legislated a controlled substance on February 27, 1991, and now requires a physician's prescription.

## ORGAN TRANSPLANTATION AND PROSTHETIC DEVISES STANDARD

**RENAL TRANSPLANTATION** may be considered disqualifying unless the applicant is not taking immunosuppressive drugs and is medically cleared by the surgeon who performed the operation to participate in strenuous activities. The applicant must be considered by the surgeon to be capable of withstanding blunt trauma to his/her flanks without a significant probability of untoward personal damage.

**OCULAR LENS IMPLANTATION** may be acceptable considering an adequate post surgical recovery period and if the visual acuity meets the medical standards. (See vision standards)

**COCHLEAR IMPLANTATION** is acceptable provided that the applicant meets the hearing standards and can localize sound satisfactorily. (See hearing standards)

**PACEMAKERS or PROSTHETIC VALVES** are generally disqualifying. Any other condition or post-surgical management that requires the use of Coumadin or other anti-coagulants is disqualifying. (See cardiovascular standards)

Other transplantations and prosthetic devises will be considered on a case-by-case basis.

## THE DERMATOLOGIC STANDARD

Any disease or condition which may cause the person to be unduly susceptible to injury or disease as a consequence of environmental exposures including the sun may be considered disqualifying. Cases will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1. **ALBINISM**
2. **SKIN CANCER** (examples are Basil Cell carcinoma, Squamous Cell carcinoma, Mycosis fungoides)
3. **CHLORACNE** (This condition should be reviewed on a case-by-case basis for its association with toxic exposures)
4. **KAPOSI'S SARCOMA**
5. **SEVERE CHRONIC DERMATITIS**

## CANCER STANDARD

Cases will be reviewed on a case-by-case basis. Further consideration will be given under the following circumstances: (all conditions must be met).

1. The cancer has a high cure rate.
2. The Oncologist declares the individual to be a complete responder with no evidence of active disease.
3. There is no evidence of medication or radiation side effects present.
4. There is no evidence of immune suppression as a result of the treatment.
5. The stage of the cancer is generally regarded as having a good prognosis.

U00341

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1.  KAPOSI'S SARCOMA
2.  SMALL CELL (OAT CELL) CARCINOMA OF THE LUNG
3.  PANCREATIC CANCER
4.  RENAL CARCINOMA
5.  METASTATIC OVARIAN CARCINOMA
6.  LEUKEMIA
7.  ADRENAL CARCINOMA
8.  NEOPLASIA OF THE CENTRAL NERVOUS SYSTEM
9.  HEPATIC CARCINOMA
10. MULTIPLE ENDOCRINE NEOPLASIA TYPE 1 & 2

U00342

# NATIONAL PARK SERVICE

# REFERENCE MANUAL
# RM 57



## Occupational Medical
## Standards and Physical Fitness





U00343

# PART I

**April 14, 1999**

Ü00344

# Occupational Medicine, Health and Fitness Reference Manual

## I.   Purpose

In order to achieve its mission to conserve park resources while providing for the enjoyment thereof by current and future generations, the National Park Service (NPS) requires a capable and diverse work force.  The purpose of the Service's Occupational Medicine, Health and Fitness program is to establish and maintain a healthy, physically fit work force through a managed program of appropriate medical surveillance and regular physical exercise.  The Health and Fitness Program is designed to reduce the risk of illness, disease and injury, to lower health care costs, and to improve employee morale and productivity.

For those employees holding rigorous physical duty positions having a high potential for exposure to occupational health hazards or on-the-job injuries, specific medical standards and/or fitness measures are applied to eliminate or minimize these potential health risks.   The Department of the Interior has approved standards for commissioned park rangers, GS-025, and those park ranger positions that have been designated for enhanced law enforcement coverage.

In order to assist all employees in achieving healthier lifestyles, which will in turn enhance individual and organizational effectiveness, a comprehensive Occupational Medicine, Health and Fitness Program, is hereby established. This *reference manual* provides two distinct yet related programs:   an Occupational Medicine Program, and an Occupational Health and Fitness Program.

This *reference manual* is issued under authority of Director's Order 57, which requires the Associate Director, Park Operations and Education, and Associate Director, Administration to promulgate reference manuals for the Occupational Medicine, Health and Fitness Program. Director's Order #57 is incorporated into the Reference Manual as section 2, below.

## II.   Director's Order 57: Occupational Medicine, Health and Fitness

This Director's Order, in conjunction with Reference Manual 57, Occupational Medical Standards, Health and Fitness, (RM-57), is a complete revision of the National Park Service (NPS) "Health and Fitness Guideline, NPS-57." Release No. 1 of NPS-57 is hereby superseded; existing copies should be discarded.

### A.   Background and Purpose

In 1993 the NPS officially determined its designated law enforcement and firefighter positions would be managed under the provisions of enhanced annuity retirement (as authorized by 18

U00345

U.S.C. 8336(c)). The purpose of enhanced annuity retirement is to enable agencies to field a work force capable of performing the rigorous duties[1] of law enforcement and firefighting.

Pursuant to 5 U.S.C. 3307, the mandatory separation age of 55 is applicable to designated firefighter positions and the mandatory separation age of 57 is applicable to designated law enforcement positions. The mandatory separation age applies to employees in commissioned positions regardless of appointment or series and includes temporary, term, and seasonal appointments.

Corresponding maximum entry ages were established at age 35 for firefighters and at age 37 for law enforcement officers to ensure employees may meet minimum qualifications for enhanced retirement. The maximum entry age applies to career and career conditional (permanent) appointments. As temporary appointments are not covered by enhanced annuity retirement, the maximum entry age does not apply to temporary, term, or seasonal appointments. However, as the mandatory separation age is applicable to all appointments, no applicant may receive a temporary, term, or seasonal appointment at or after age 57 for law enforcement positions and at or after age 55 for designated firefighter positions.

In 1996 the Service completed a field study of the actual work of park rangers performing primarily law enforcement duties to enable the Department of the Interior to establish a medical standard for those positions. The study evaluated the work of park rangers performing law enforcement under actual conditions and circumstances and developed proposed medical standards. The Department of the Interior, on July 2, 1998, approved (under authority contained in 5 CFR 339.202) the resulting medical standard for commissioned park rangers.

The purpose of this Director's Order (as supplemented by the Reference Manual 57) is to establish implementing procedures for the medical standards and revise policy for a physical fitness program for designated positions performing rigorous duties.

In addition to meeting requirements of law and regulation, the medical standards will substantially improve the safety and professionalism of employees performing law enforcement, fire fighting and other rigorous duties. The standards are designed to ensure that employees performing law enforcement are physically able to perform that duty and that their performance does not constitute a threat to the health and well being of themselves, their fellow employees, and park visitors.

---

[1] "Rigorous position" means a position, the duties of which are so rigorous that employment opportunities should, as soon as reasonably possible, be limited (through establishment of a maximum entry age and physical qualifications) to young and physically vigorous individuals...." (5 C.F.R. 842.802)

4

U00346

The Service will achieve its public trust responsibility to provide effective, efficient law enforcement and firefighting services by fielding a well-trained, physically conditioned, fully capable work force. Beyond law enforcement and firefighting services, a healthy and physically fit work force is the key to avoiding lost work time due to injury and illness.

Healthy, fit employees are far more productive and less costly than employees requiring extended medical leave and rehabilitation. For these reasons, a secondary purpose of this Director's Order is to extend and reconstitute the Service's voluntary (optional) health and fitness program for all employees, regardless of their job duties.

## B.     Authority

The general authority to issue this Director's Order is contained in the NPS Organic Act (16 U.S.C. 1 through 4), and part 245 of the Department of the Interior manual. The specific authorities and requirements applicable to employees performing physically rigorous duties covered by this Director's Order are found in:

*Law*

5 U.S.C. 3301.  Civil service; generally
5 U.S.C. 3307.  Competitive service; maximum-age entrance requirements; exceptions

*Regulation*

5 CFR Part 300-Employment (General)
5 CFR Part 339- Medical Qualification Determinations
29 CFR Part 1910- Occupational Health and Safety

*Office of Personnel Management Requirements (OPM)*

OPM operating manual: Qualification Standards for General Schedule Positions; Section IV, Qualification Standards, and Section VI, Medical Requirements

*Departmental Policy*

DM-446 Law Enforcement
Department of the Interior Occupational Medicine Manual and Reference Manual
Medical Standards, Commissioned Park Rangers, GS-025, approved July 2, 1998

## C.     Operational Policies and Procedures

**C.1**     The Service will adopt appropriate medical standards and provide opportunities for designated employees to develop and maintain their physical fitness. The general goal is to establish, encourage, promote, and maintain an efficient and productive work force. The more

5

specific goal is to ensure that all employees assigned law enforcement, fire fighting, and other physically rigorous duties are able safely to perform those duties.

**C.2** The Associate Director, Administration, and the Associate Director, Park Operations and Education, are jointly assigned functional authority for the Service's Occupational Medical Standards, Health and Fitness Program. They will promulgate and periodically revise reference manuals, training courses and materials, certifications, and other necessary materials and documents to implement and operate this program consistent with the policies, procedures and authorities contained in this Director's Order.

**C.3** The Associate Director, Administration, and the Associate Director, Park Operations and Education, will distribute and otherwise reproduce within Reference Manual-57 medical standards approved by the Department of the Interior for park ranger (protection) positions, and by the OPM for firefighter and other positions. Medical standards for other positions may be found in the OPM operating manual, "Qualification Standards for General Schedule Positions" and/or Reference Manual-18, Wildland Fire Management. All standards must be applied uniformly by all managers throughout the Service.

**C.4** Servicewide consistency in the implementation and operation of this program is vital and required. Coordination and integration of the Occupational Medical Standards, Health and Fitness Program within existing functional and organizational structures must take place and be coordinated primarily at the Washington Office level by senior officials assigned by the Associate Director, Park Operations and Education and the Associate Director, Administration.

**C.5** In order to ensure Servicewide consistency, final Service decisions regarding the medical and physical fitness of individuals to perform physically rigorous operational functions and associated training activities will be made by the Associate Director, Administration. An appeal of a medical standards disqualification determination must be made by an employee within 30 calendar days of receipt of notification of disqualification. The decision of the Medical Standards Board (MSB) will constitute the final agency decision. Pursuant to 270 DM 771.3.5B, appeals of medical standards disqualification determinations are processed through the procedures of the MSB and are not subject to review by the administrative grievance procedure. In cases appealed to the MSB, the board chairperson will issue final Service decisions.

**C.6** An *applicant* who does not meet the OPM or Departmental medical standards established for such work may not be appointed to a position designated for enhanced law enforcement or firefighter retirement. This applies to career, career-conditional, term, and temporary appointments.

**C.7** An *employee* who does not meet the medical standards established for such work may not perform law enforcement or fire fighting work, regardless of whether the duties are primary to the position or collateral, unless the Medical Standards Board approves a request for reasonable accommodation.

6

UO0348

**C.8**    An *employee* may not be admitted to law enforcement or firefighting training that requires the *regular or frequent* performance of rigorous duties unless s/he meets the medical standards established for persons performing such duties.  Any employee may be admitted to training that requires only *occasional or incidental* performance of rigorous duties.

**C.9**    The Medical Review Officer (MRO) (who may be an employee or contractor) will make initial (pre-hire) medical qualification recommendations which will then be subject to approval by the Associate Director, Administration (or designee).

**C.10**    The Medical Review Officer will make post-hire (career or temporary employees) medical qualification recommendations on a regularly scheduled basis as defined in Reference Manuals 18 and 57.  The Associate Director, Administration (or designee) will issue medical qualification decisions.

**C.11**    Reasonable accommodation may be considered in each instance of medical disqualification of an employee if the disqualification is the result of disability.  In the event park management is or should be aware of an obvious or apparent disability, the employee's supervisor or manager should seek assistance through equal opportunity professionals and request accommodation on behalf of the employee.   In the event the disability is not obvious or apparent, the employee may request such accommodation to the park superintendent or appropriate manager.  The superintendent will forward the request and his/her recommendation through the regional director to the (WASO) Human Resources Program Manager.  All requests for reasonable accommodation for disability as a result of medical disqualification must be reviewed and approved by the Medical Standards Board *prior to implementation*.

**C.12**    The Associate Director, Park Operations and Education, and Associate Director, Administration will appoint the MSB.  The MSB will consist of:  1) the Chief, Ranger Activities Division (or designee); 2) the Chief Law Enforcement Officer or the Program Manager for Wildland Fire Operations, or other appropriate risk program manager; 3) a senior Service safety manager; 4) the MRO; and 5) the Human Resources Program Manager (or designee).   The Human Resources Program Manager (or designee) will serve as the MSB chairperson.

**C.13**    The MSB chairperson will be the deciding official in reasonable accommodation determinations and will be the spokesperson for the MSB before any third party.

**C.14**    The Service will use the Physical Efficiency Battery (PEB) of measurements developed at the Federal Law Enforcement Training Center (FLETC), as the mandatory physical fitness test for initial appointment to a position whose duties are primarily law enforcement.  The Service will use the applicable Work Capacity Test Series as physical fitness test for appointment to designated firefighting positions.

U00349

**C.15** The PEB and the Work Capacity Test Series will be threshold tests and baseline fitness measures. The Service will generally not place persons failing to pass the PEB or the Work Capacity Test Series in law enforcement or firefighter training that requires the regular performance of rigorous duties.

**C.16** For current employees performing law enforcement and/or firefighting duties, the PEB and the Work Capacity Test Series will serve to identify individuals who are potentially at high risk of injury or disease by continuing to perform the rigorous duties of their position. By administering the PEB and the Work Capacity Test Series, the Service will identify employees whose physical condition may pose a potential health or safety risk to themselves, to coworkers, or to the public. The Service may require these employees to reduce or eliminate that potential risk through mandatory participation in a health and fitness program focused on positive improvement and achieving fitness results.

**C.17** All parks and units employing park rangers or other employees assigned law enforcement or firefighting duties may provide each such employee 3 hours of mandatory-participation physical fitness exercise time per workweek. Pursuant to Director's Order 18, those wildland firefighters whose full-time duties are 100 percent arduous duty-related (such as helitack, hotshot, engine, prescribed fire, smokejumper crews) will normally be provided 1 hour per day for fitness training. Parks and units may provide or make available appropriate and safe facilities and equipment to enable each mandatory-participation employee to maintain adequate physical conditioning to perform safely the rigorous duties assigned. Park managers may develop on-site fitness facilities and/or provide for employee participation in fitness facilities within a reasonable distance to the park or office.

**C.18** The Service will continue to invest in the health and physical well being of all its employees, regardless of job series or duties, as authorized by 5 U.S.C. 7901 and 16 U.S.C. 1a-2(b). Service managers are encouraged to support voluntary fitness programs to promote the physical and mental fitness of employees under their supervision. Managers may utilize flexible and alternative work schedules, grant annual leave or leave without pay, disseminate information concerning community-based programs, offer in-house fitness and health education programs, and use other appropriate means to support employee health and fitness goals.

*End Director's Order*

## III.   Standards and Measures

This *reference manual* addresses medical and fitness topic for those positions covered under both *mandatory* participation fitness programs as well as *voluntary* participation programs. Both programs address employee health concerns and provide individual employees with recommendations specific to their needs.

The objective of the medical standards and physical fitness program is to achieve and maintain

U00350

each employee's ability to perform their duties safely and effectively.

## Definitions:

**Accommodation**

Accommodation means reasonable accommodation as described in 29 CFR 1613.704.

**Arduous or hazardous positions**

Positions that are dangerous or physically demanding to such a degree that an incumbent's medical condition is necessarily an important consideration in determining ability to perform safely and efficiently.

**Medical condition**

Health impairment which results from injury or disease, including psychiatric disease.

**Medical documentation**

A statement from a licensed physician or other appropriate practitioner which provides information the agency considers necessary to enable it to make an employment decision. To be acceptable, the diagnosis or clinical impression must be justified according to established diagnostic criteria and the conclusions and recommendations must not be inconsistent with generally accepted professional standards. The determination that the diagnosis meets these criteria is made by or in coordination with generally accepted professional standards. The determination that the diagnosis meets these criteria is made by or in coordination with a physician or, if appropriate, a practitioner of the same discipline as the one who issued the statement.

**Occupational Medicine Program**

An overall system of applicant and employee medical examinations and career-long medical surveillance. The occupational medicine program can be used in all work-related circumstances, stressing accurate and *consistent* application of medical findings for all individuals in similar positions with similar duties. The occupational medicine program has two components; one for positions having specific medical qualification standards for physically rigorous duties and one for positions having general medical standards.

**Medical Surveillance Program**

A system of recurring medical examinations or tests established by written agency policy or

9

000351

directive to safeguard the health of employees whose work may subject them or others to significant health or safety risks due to occupational or environmental exposure or demands.

**Medical standard**

A written description of the medical requirements for a particular occupation based on a determination that a certain level of fitness of health status is required for successful performance. Medical standards are conditions of employment and must be met prior to employment or prior to consideration in a position when these standards apply.

**Physical requirement**

A written description of job-related physical abilities which are normally consider essential for successful performance in a specific position.

**Occupational Fitness Program**

The Service's overall work force physical fitness program. The occupational fitness program provides appropriate exercise equipment and exercise facilities, individual fitness evaluations and counseling, and individualized physical fitness development and maintenance programs for all employees. The occupational fitness program has two components; a mandatory program for employees in positions having mandatory physical requirements *essential* for successful job performance, and a voluntary program providing all employees with an opportunity to maintain general fitness.

All incumbents of rigorous-duty positions have essential medical and physical fitness requirements and are enrolled in the *mandatory* fitness program, while all other employees are encouraged to participate in the *voluntary* fitness program.

**Rigorous Position**

A position the duties of which are so rigorous that employment opportunities should, as soon as reasonably possible, be limited (through establishment of a maximum entry age and physical qualifications) to physically vigorous individuals.

**Authority:**

The following excerpts of selected text from applicable laws, regulations, and policies are provided for the reader's convenience:

**Law**

5 U.S.C. 3301. Civil Service; generally

U00352

The President may:

(1) Ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment sought;

5 U.S.C. 3307. Competitive service; maximum-age entrance requirements; exceptions:

(d) The head of any agency may determine and fix the minimum and maximum limits of age within which an original appointment may be made to a position as a law enforcement officer or firefighter, as defined by section 8331(20) and (21) respectively, of this title.

(e) The head of an agency may determine and fix the maximum age limit for an original appointment to a position as a firefighter or law enforcement officer, as defined by section 8401(14) or (17), respectively, of this title.

**Regulation**

5 CFR Part 339- Medical Qualification Determinations

339.101 Coverage

This part applies to all applicants for all employees in competitive and excepted service positions;

339.102 Purpose and Effect

(c) Failure to meet a properly established medical standard or physical requirement under this part means that the individual is not qualified for the position unless a waiver or reasonable accommodation is indicated, as described in ϶϶339.103 and 339.204. An employee's refusal to be examined in accordance with a proper agency order authorized under this part is grounds for appropriate disciplinary or adverse action.

339.202 Medical standards

OPM may establish or approve medical standards for a Government-wide occupation (i.e., an occupation common to more than one agency). An agency may establish medical standards for positions that predominate in that agency (i.e., where the agency has 50 percent or more of the positions in a particular occupation). Such standards must be justified on the basis that the duties of the position are arduous or hazardous, or require a certain level of health status or fitness because the nature of the positions involve a high degree of responsibility toward the public or national security concerns. The rationale for establishing the standard must be documented. Standards established by OPM or an agency must be:

000353

- Established by written directive and uniformly applied,
- Directly related to the actual requirements of the position, and
- Consistent with OPM instructions published in FPM chapter 339.

339.203 Physical requirements.

Agencies are authorized to establish physical requirements for individual positions without OPM approval when such requirements are considered essential for successful job performance. The requirements must be clearly supported by the actual duties of the position and documented in the position description.

339.205 Medical evaluation programs.

Agencies may establish periodic examination or immunization programs by written policies or directives to safeguard the health of employees whose work may subject them or others to significant health or safety risks due to occupational or environmental exposure or demands. The need for a medical evaluation program must be clearly supported by the nature of the work. The specific positions covered must be identified and the applicants or incumbents notified in writing of the reasons for including the positions in the program.

842.804 Evidence.

(a) An agency head's determination under ∋802.803(a) (finding that a position is a rigorous position) must be based solely on the official position description of the position in question and any other official description of duties and qualifications. The official documentation for the position should, as soon as is reasonably possible, establish that the primary duties of the position are so rigorous that the agency does not allow individuals to enter the position if they are over a certain age or if they fail to meet certain physical qualifications (that is, physical requirements and/or medical standards), as determined by the employing agency head based on the personnel management needs of the agency for the positions in question.

## Occupational Medicine Program

### Purpose

The purpose of the Occupational Medicine Program is to provide a safe work environment for employees by ensuring that employees meet medical standards for their position. For employees exposed to known hazards or required to perform rigorous duties, measures are instituted to diminish the potential adverse effects by means of appropriate medical standards and/or services and to ensure that they are medically fit to perform rigorous duties.

12

U00354

Employees and applicants for positions covered by specific medical standards must continually meet those medical standards.

Applicants for positions covered by validated physical fitness requirements must meet those requirements for appointment to those positions and must thereafter participate in fitness programs. Employees in positions covered by validated physical fitness requirements are encouraged to continue to meet validated physical fitness standards after initial appointment and must participate in fitness programs.

Employees in rigorous duty positions must be physically and medically fit and able at all times to safely perform the arduous, hazardous, and physically demanding duties of their positions. Procedures outlined herein may also be used to evaluate the medical capability of employees in positions that do not have specific medical or fitness standards safely to perform their duties.

## Positions Having Specific Medical Standards

The OPM requires that agencies establish medical/physical qualifications for individuals entering and retaining positions that primarily perform rigorous (physically arduous) duties. The Service applies these medical/physical qualifications to all positions in which rigorous duties are assigned whether as a primary or collateral duty. This applies whether the employee encumbering a position is in a career, term or temporary appointment. Agencies must establish realistic standards to ensure applicants/incumbents are physically capable of performing the essential duties/tasks of the position safely and efficiently, without causing risk to self or others.

Specific medical standards and a medical surveillance program are intended to allow the Service to determine if applicants or incumbents have any medical condition(s) that would prevent them from performing, with or without reasonable accommodation, the essential functions of the position without posing a significant risk to the safety and health of self or others. The Service must determine if an employee's existing medical condition or health status will be aggravated and/or worsened by the physical demands and/or working conditions of the employee's job or work conditions.

## Positions Without Specific Medical Standards

For employees in positions without specific medical standards, the Service seeks to:

Detect patterns of disease/injury that are work-related:

- Provide employees with information about occupational hazards and present health; and
- Provide preventive medical health assessments and recommendations on a voluntary basis.

13

U00355

**For All Positions**

For all employees and applicants for employment, the Service seeks to:

- Provide a consistent basis for examining and evaluating the medical qualifications and fitness for duty of an applicant/employee;
- Provide a consistent basis for evaluating requests for reasonable accommodation; and,
- Comply with the provisions of the Rehabilitation Act of 1973 and Amendments of 1992, the Equal Employment Opportunity Commission's ("EEOC") implementing regulations and 5 CFR 339, Medical Qualification Determinations.

The purpose of these objectives is <u>not</u> to provide routine preventive or diagnostic medical services. Preventive medicine services are important and worthwhile, but are complementary to, rather than a substitute for, job-related medical examinations. Routine medical examinations continue to be the responsibility of the individual employee.

## Organization of the Occupational Medicine Program

### Rigorous Duty Medical Examinations and Qualification Determinations

The medical examination program has two basic components. The first is a comprehensive medical examination; where each applicant or incumbent of a law enforcement (or firefighting) position receives a comprehensive medical examination. Medical examinations are administered by a qualified medical provider acceptable to the SERVICE, following the specific examination protocol provided. The second is a medical qualification determination made by comparing the medical condition of the individual against the medical standards for the position.

For the first component, sufficient medical information must be obtained to enable a professional medical-qualification decision to be rendered. The examining physician checks all items of medical significance necessary to accurately report sufficient medical information to fully describe the individual's current medical condition, including reviewing the individual's medical history. Personal physicians, medical specialists, and treating physicians may be consulted by the examining physician and/or the reviewing physician for more in-depth medical information and prognosis if needed. The results and findings of the medical examination are forwarded to the Service's designated MRO.

The MRO is a physician who has observed and studied the work of law enforcement officers, including National Park Service rangers. The MRO is also the expert regarding state-of-the-art medical research and practice regarding the performance of law enforcement work. Both knowledge of the work and knowledge of medicine are necessary in order to make sound evaluations of an individual's ability to perform law enforcement safely and effectively. As a recognized subject-matter expert, the MRO is able to explain, defend, and justify the medical and occupational basis for his/her occupational medicine conclusions.

14

000356

The second component is the rendering by the MRO of a consistent professional medical determination of the qualification of the applicant or incumbent to perform the duties of the position safely. Information provided to the MRO must include medical history, current medical evaluation, and description of critical job duties, potential health risk exposures, and any information about previous exposures to known health risks. Consultations with personal physicians, treating physicians, specialists, or medical professionals may be necessary. In addition, the MRO must be informed of any potential for future exposure to occupational illness or diseases known to the Service, that could affect the health or safety of the individual or co-workers.

The most important characteristic of the medical review system is that the examining physician concentrates on patient examination, and the MRO concentrates on the relationship between the medical data (provided by the examining physician) and the known characteristics of the job.

The MRO will be able to render a consistent medical recommendation on all applicants and incumbents for park ranger law enforcement and/or firefighting positions.

Specific knowledge of the tasks typically performed and the conditions under which the tasks are performed are a crucial component necessary to render an accurate occupational medicine opinion. As a specialist in law enforcement occupational medicine, the MRO must be a recognized medical expert in regard to Federal law enforcement.

For incumbents, a medical specialist's "opinion" or a specialized medical test(s) may be requested by the MRO, when the MRO is uncertain about the extent, limitations, or prognosis of an individual's condition. A private physician's opinion or further medical evaluation(s) may be voluntarily obtained by the incumbent and submitted to the MRO for further consideration.

The Human Resources Program Manager (or designee), in consultation with the Program Manager, Ranger Activities (or designee) issues medical disqualification determinations. Decisions will be based upon the medical determinations of the MRO, including full consideration of any evaluation obtained from the employee's physician, and any relevant information that is submitted for consideration. Medical disqualification may be appealed to the MSB chairperson.

## Employee/Applicant Responsibilities

The NPS occupational medicine program includes mandatory pre-placement/post conditional offer and baseline medical evaluation, periodic medical evaluations and return to duty or fitness for duty examinations. Participation in the occupational medicine program is mandatory for all applicants and incumbents assigned rigorous duties. Employees must report known prior exposures, provide complete and accurate medical information to the examining and reviewing physicians, and disclose any prior health issues or treatments, including mental health issues or treatment, so that the MRO can make an informed medical determination.

000357

Sufficient medical information as required by the MRO must be provided in order to render a medically sound qualification determination. In the absence of sufficient medical information to support qualifying an individual for a rigorous duty position, a disqualification must be issued in the interest of public and individual safety. Withholding, falsifying, distorting, or misrepresenting relevant medical (including mental health) information may lead to medical disqualification and/or disciplinary or adverse action. Falsifying an application or withholding medical information may significantly compromise the safety of a law enforcement officer and/or his/her fellow officers. It is the policy of the Service that the penalty for falsification or withholding of medical information in regard to medical examination for a rigorous duty position is removal from Federal service (see Department of the Interior Handbook on Charges and Penalty Selection for Disciplinary and Adverse Actions, Table of Penalties, item 22a. "Falsification, misrepresentation or omission of fact in connection with application for employment or other personal history record with respect to a material fact or point which would have adversely affected selection for appointment").

Each applicant or current employee shall report to the examining physician and/or MRO any significant exposure (i.e., chemical, infectious, or biological, etc.) and/or any medical condition that may interfere with his or her ability to perform the full range of duties required for the position. The occupational medicine program includes mandatory preplacement/post conditional offer medical evaluation, baseline medical evaluation, periodic medical evaluations, and return to duty or fitness for duty examinations. Participation in the occupational medicine program is mandatory for all applicants and incumbents of rigorous duty (6c) positions. Employees shall voluntarily report known prior exposures, provide complete and accurate medical information to the examining and reviewing physicians, and disclose any prior health issues or treatments, including mental health issues or treatment, so that the MRO can make an informed medical determination.

## Medical Examination Program

### Preplacement/post Conditional Medical Examinations and Baseline Medical Examinations

During the application process for positions with medical standards, a medical examination must be administered prior to selection. A preplacement/post conditional medical examination is an examination that occurs after the applicant has accepted an offer of employment with the condition that applicant complete the examination and receives a satisfactory medical evaluation. The preplacement/post conditional medical examination is required in order to assure that the applicant is medically qualified for a rigorous-duty position.

Preplacement/preincident medical examinations are required for all applicants and employees prior to entering into a training program, qualifying to perform any emergency situation or hazardous-environment work (i.e., health hazard investigations, aircraft pilot, scuba diving, rigorous rescue duties, etc.) whenever specific, approved medical standards for such work exist.

16

The MRO will evaluate each medical examination against the specific medical standard. The MRO will assess the potential effect of any existing medical condition(s) on the applicant or employee's ability to safely perform the full range of duties of the position or to work safely in the unusual operational environment.

No one will be certified (qualified) as meeting the medical requirements of a position if the MRO determines that the applicant has a medical condition preventing the applicant from safely performing, with or without reasonable accommodation, the full range of duties of the job.

A baseline medical examination is administered post-hire and is used to establish the condition of an individual's medical health on a given date. This data can then be compared to subsequent periodic medical evaluation results for the purpose of determining whether the individual has any significant health trends that may be occupationally related.

**Periodic Medical Surveillance Examinations**

In order to assure a continued acceptable level of health and medical fitness and to ensure the performance of the full range of duties, periodic medical evaluations are administered to all employees in occupations/jobs having specific medical standards. All employees in rigorous duty designated positions or assigned rigorous duties must receive periodic medical examinations. Employees under age 40 receive periodic medical examinations every 2 years. Employees age 40 and older will receive periodic medical examinations annually. Examinations should occur within 1 month of the employee's birthday.

The MRO will:

- Determine if incumbent has developed any medical condition/s that would prevent him/her from performing, with or without reasonable accommodation, the essential functions of an enforcement job without posing a significant risk to the safety and health of him/herself or others;
- Determine if health status will be aggravated and/or accelerated by physical demands and conditions of the job;
- Detect changes in employee's health status that may be caused by harmful working conditions;
- Detect patterns of disease/injury that are work-related;
- Provide employees with information about occupational hazards and health maintenance advice;
- Comply with the Rehabilitation Act of 1973, EEOC Guidelines and 5 CFR 339 Medical Qualifications Determinations;
- Provide occupationwide preventive medical health assessments and recommendations on an as-requested basis;
- Enter and regularly analyze medical information in an electronic medical record database and ensure that tightly restricted access to such records is maintained in accordance with law and

17

regulation;

## Return to Duty and Fitness for Duty Examinations

*Return to Duty Examinations* are given to an employee who has been absent from duty due to a medical condition that the employee's immediate supervisor (or higher-level managers) feel may threaten the employee's ability to safely and efficiently perform the full range of duties required.

The medical examination results will be evaluated by the MRO (by reviewing medical reports provided by the employee's treating physician, etc.), before the employee is returned to duty. The MRO will not recommend the employee's return to the rigorous duty position if any medical condition is present that may potentially affect the individual's ability to perform all the essential functions of the job safely. The MRO, in conjunction with supervisors and management, shall take into account the employee's current duty assignment(s) and alternative duty assignments or other programs designed to allow an individual to gradually return to full duty.

*Fitness for Duty Examinations* may be ordered in two situations; whenever an employee raises a medical condition as an affirmative defense for a time and attendance, conduct, or performance

deficiency; and when management has a direct question about an employee's continued capacity to meet the physical or medical (including mental health) requirements of the position.

## Occupations with Medical Standards for Rigorous Duty Positions

This section provides guidance on determining if an employee is governed by a mandatory standard(s). Using this information proper selection of the appropriate medical evaluation is possible.

In the NPS, some standards apply to an entire occupational series, while others apply to some sub-grouping of a series, or actual duties performed in a given position. In some cases what is needed is a "clearance for use" such as those required for Self Contained Breather Apparatus (SCBA).

In all these cases, determinations may be provided as a distinct examination and clearance process or as part of an examination and review carried out for other purposes (e.g., a comprehensive medical surveillance program).

## Law Enforcement Positions 

The job requirements for law enforcement employees of the Service are by their nature rigorous and hazardous. These job requirements are performed under variable and unpredictable working conditions. Due to their job requirements and working conditions, the Service has developed an occupational safety and health program that includes medical standards for the park ranger (protection). The Service applies Governmentwide medical standards for criminal investigator



18

and jailor positions.

## Wildland Firefighter Positions

The job requirements for wildland firefighter employees are by their nature rigorous and hazardous. Guidelines developed by the National Fire Protection Association (NFPA) for medical examinations (NFPA 1582 - Medical Requirements for Firefighters, 1992; and NFPA 295 - Wildfire Control, 1991), and by the National Wildfire Coordinating Group for fitness (Wildland Fire Qualification Subsystem Guide - 310-1, October 1993) have been incorporated in this edition of the *reference manual*, pending anticipated updates or revisions.

## Diver Positions 

The job requirements for employees involved in dive operations are by their nature arduous and hazardous.

## Pilot/Aviator Positions 

Individuals whose functions include piloting aircraft must meet the medical standards and certification requirements of the Federal Aviation Regulations, as presented in 14 CFR 67.


# Occupational Medicine Program Roles and Qualifications

## Occupational Health and Fitness Program Manager

The Occupational Health and Fitness Programs Manager will serve as the focal point for all aspects of the occupational health and fitness program.

Specifically, the manager will serve as the central authority for all program and policy determinations; the central point of contact for all external agency issues; and as the central clearinghouse for the occupational health and fitness program.

The Occupational Health and Fitness Program Manager, designated by the Associate Director, Park Operations and Education, is responsible for:

1.    Implementing Reference Manual 57 and the national medical and fitness goals.

2.    Providing general occupational medical, health and fitness information to field offices in cooperation with central office Health and Fitness Coordinators (HFC).

3.    Approving qualifications and protocols for HFCs.

19

U00361

4.    Representing the Service on the President's Council on Physical Fitness and Sports.

5.    Coordinating occupational medical, health and fitness management activities with the Department of the Interior, FLETC, and various outside agencies, committees, and other organizations.

6.    Providing a clearinghouse on training techniques, testing, and equipment.

**Medical Review Officer**

The MRO shall be a currently licensed doctor of medicine (M.D.) or osteopathy (D.O.). At a minimum, the MRO should be board certified or board eligible in the field of occupational medicine. The MRO shall be qualified to provide professional expertise in the areas of occupational safety and health as they relate to the program and policies established under this program.

The MRO will provide or oversee the following advisory and consultative services:

- Up-to-date and complete medical and technical information regarding specific medical and physical conditions or medical examination procedures relevant to existing or proposed physical requirements or health related personnel management programs for employees;

- Review and approval of results and conclusions derived from medical examinations conducted by Government or contract physicians;

- Technical assistance (including advisory opinions in medical and occupational health areas, e.g., worker's compensation, disability retirement, medical standards, civil lawsuits, MSPB challenges, EEOC cases. etc.) to ensure compliance with agency policy;

- Expert review and analysis of medical documentation and other materials submitted in support of:

    (1)    medical/physical qualifications of applicants,

    (2)    employee restoration rights under 5 U.S.C. 8151 following full or partial recovery from a comp

    (3)    requests for job accommodations or other special benefits to health conditions.

- Written reports on medical standards, medical policy issues, or individual medical documentation reviews as requested;

- Guidance in resolving complex medical/personnel management issues;

000362

- Guidance regarding new and experimental procedures (i.e., radial keratotomy, surgical implants, prosthetic devices) as a means of satisfying medical, vision, hearing requirements, etc.;

- Preparation of reports summarizing findings, analysis, conclusions, and recommendations for use in fulfilling complex managerial responsibilities related to the medical evaluation and clearance process;

- Research and analysis of complex legal and medical issues through coordination with the Office of the Solicitor;

- Research and analysis of technical, scientific and medical data in support of policy development and program management;

- Assistance in the development and implementation of a comprehensive and cost-effective Occupational Medical Evaluation and Clearance Program for candidates and incumbents, including such services and topics as:

  → Pre-employment medical evaluations
  → Periodic medical evaluations
  → Return-to-duty medical evaluations
  → Preventive medicine counseling

Human Resources Program Manager (s)

The Human Resources Program Manager will notify employees and managers of new or revised Governmentwide, agency and bureau human resources policies and procedures that may impact safety or health. These include drug testing, hazardous work site qualifications, and motor vehicle operator qualifications.

Servicing personnel offices will maintain employee occupational health records including audiograms, physical examination results, exposure records, and physician reports, recommendations, and summaries as they relate to occupational exposures, injuries, illnesses, return to duty, and physical qualifications.

**Health Care Providers**

The role of the health care provider in this occupational medicine program is that of primary provider of clinical services (including both routine and emergency services), consultant to employees receiving services and to the agency/program MRO, and professional data gatherer regarding health effects of workplace exposures and the health status of employees. Health care providers may include professionals from a variety of professional backgrounds, including physicians, nurses, nurse practitioners, audiologists, audiometricians, laboratory technologists,

and others in the health care arena. All health care providers, including individual or corporate entities, who provide services for employees are expected to do so in a manner consistent with this *reference manual*, the specified terms of their contracts or agreements with the Service, and local standards for health care services.

**Examining Physician Qualification Standards/Credentials**

Many of the NPS positions for which employees will receive medical examinations involve some aspect of exposure to chemical substances, or because of the arduous and/or hazardous nature of the work itself. The clinical examination services provided must be performed by or under the supervision of a licensed physician, preferably one knowledgeable in occupational medicine. The examining physicians, whether they serve as individual contractors, or through a larger clinic or multi-agency arrangement, should demonstrate that they possess necessary credentials, including:

- Current medical licensure in the State where services will be provided; and

- Current certification, or eligibility for certification, by the national board for an appropriate medical field, e.g., occupational medicine, preventive medicine, internal medicine, family practice; (certification in occupational medicine is highly preferred, though certification in another specialty, and additional training in occupational medicine, is acceptable);

- Possess current medical practice liability insurance (minimum coverage of $1 million per occurrence and $3 million in aggregate are recommended) or, if a Federal employee, the services they plan to provide for NPS are covered by their current position description and/or personnel orders (the Federal Tort Claims Act provides liability protection for Federal employees while performing official duties, including carrying out medical services);

- Are available to meet the specified examination needs of the covered employees, and are available to respond to urgent consultation or health care needs following exposure incidents;

- Have access directly, or via contract, to certified laboratory services for blood and urine testing (including testing for agents, or the biological effects of agents, such as heavy metals, pesticides, and polychlorinated bi-phenyls); in turn, these laboratories should be able to demonstrate current certification of program quality, such as accreditation by the College of American Pathologists, certification as a Medicare provider, or active participation in the Clinical Laboratory Improvement Program of the Centers for Disease Control and Prevention or the American Association for Clinical Chemistry;

- Have access directly, or via contract, to radiology services, including over-reads by board certified radiologists and, for any asbestos exposure, radiologists certified for Ab-readings≅;

- Use certified, regularly calibrated equipment for pulmonary function testing, audiometry, and

22