IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

DAVID A. ATKINS                                                                                    PLAINTIFF

V.                                                                         CAUSE NO.: 1:10CV40-SA-JAD

KEN SALAZAR, SECRETARY,
DEPARTMENT OF THE INTERIOR                                                           DEFENDANT

MEMORANDUM OPINION

Defendant has filed a Motion to Dismiss, or, in the Alternative, for Summary Judgment [4].[1] After reviewing the motion, response, rules, and authorities, the Court finds as follows:

*Factual and Procedural Background*

David A. Atkins began his employment with the Department of Interior's National Park Service (NPS) as a Law Enforcement Park Ranger on May 12, 1984. Atkins was diagnosed with Type 1 (insulin-dependent) diabetes in 1986. On June 27, 2000, pursuant to the NPS's Occupational Medical Standards, Atkins was found not medically qualified to perform the essential functions of his job due to his poor vision and uncontrolled diabetes. As to his diabetes, the Medical Review Form evidenced that Atkins' blood sugar was elevated to 218 during testing. On July 31, 2002, Atkins was granted a medical waiver from the Medical Review Board (MRB), with specific considerations that he was ordered to follow. That waiver was based, in part, on Atkins' diabetic condition "becoming well controlled," Atkins' close working association with his endocrinologist,

---

[1]Plaintiff has requested to file a sur-reply to address new issues brought up in the Defendant's reply [17]. Plaintiff's motion will be granted in part. The Court will only consider those arguments rebutting the issues that Plaintiff has not had an opportunity to address. In particular, only pages 9 through 12 of Plaintiff's surreply have been considered.

and his maintaining consistent blood glucose logs. In 2003,[2] the MRB granted him another medical waiver. Some of the conditions of his medical waiver included:

- Providing documentation to the Medical Standards Program Manager that his diabetic condition continued to be controlled on the insulin pump;

- Increasing the frequency of blood testing while on duty until his condition "evidence[d] stabilization;"

- Carrying a back up system to his insulin pump; and

- Participating in a regular exercise program and providing documentation of such program to his supervisor quarterly.

Atkins came under medical review in 2005, and once again, the MRB concluded that he was not medically qualified to complete the essential functions of his job. This time, however, the MRB declined to issue another waiver due to Atkins' non-compliance with the conditions imposed by the previous medical waivers. On August 12, 2005, Atkins received a Medical Board of Review Determination Memorandum informing him of the denial of his requested waiver of his medical condition. That memorandum outlined the following reasons for denial of waiver:

1. Your diabetic condition, as described by your physician, is not well controlled. Noted on your chart of January 25, 2005 is the following "he doesn't check enough to correct [blood glucose] accurately" and on July 8, 2004 ". . . the pump just can't compensate for these eating habits."

2. You have several incidents of hypoglycemia and stated to the MRB that you did not need to take sick leave due to the episodes of hypoglycemia. Your most recent Log Book Report spanning 3/14/2005 - 4/13/2005 revealed seven episodes of hypoglycemia with blood sugars recorded as *40* on March 25, 2005; *42* on March 29, 2005; *44* on March 31, 2005; *46* on April 8, 2005; *44* at 4:40 pm and then *38* at 8:24

---

[2]Pursuant to the Occupational Medical Standards, medical reviews were required once yearly once an employee reached the age of 40.

pm on April 10, 2005, and *48* on April 11, 2005. Your log book spanning January 22, 2005 through February 21, 2005 revealed eleven days with one or more episodes of hypoglycemia.

3. Your diabetic condition has been monitored for several years, and despite close monitoring with Dr. Sherry A. Martin, The Endocrine Clinic, Diabetes, Endocrinology, and Metabolism, Tupelo, Mississippi, requirements of a medical waiver granted by the National Park Service and use of an insulin pump, your diabetes is not static and stable as outlined in 5 CFR 339, Medical Qualification Determinations.

4. You have not been diligent in monitoring your blood sugar levels as documented in your medical chart and as required by your initial waiver. The Medical Standards Office has not received the required quarterly logs.

5. According to your medical file, your blood sugar fluctuations are largely due to your failure to maintain a proper diet and nutrition as required to control your diabetes. Dr. Martin hoped to stabilize your HGB A1C as stated, "the American Diabetes Association recommended goal for this value is less than or equal to 7.0 and this will be my personal goal for his level of control", (letter dated May 22, 2001) however most of your HGB A1C levels have remained consistently above 8.0 and as high as 10.2, which demonstrates you have not controlled your diabetes.
. . .
The record demonstrates repeated and significant blood sugar fluctuations that the MRB has determined undermine your ability to perform the essential functions of your position of law enforcement ranger. . . .

To explain the fluctuations in his blood glucose levels, Atkins testified, " . . . unfortunately doing what a lot of law-enforcement people do is our diet's not exactly the greatest thing in the world, because if you're on patrol and you're the only one working, you can't exactly go someplace and have a decent meal. So you run through a fast-food place." He then attributed his blood glucose difficulties to the shift work of Law Enforcement Park Rangers and admitted that sometimes he patrolled his assigned section of the Natchez Trace himself. Regardless of the reasons, MRB determined that Atkins diabetes was unstable and uncontrolled, and it denied a medical waiver on that basis. Consequently, Atkins was offered a Staff Ranger position, which he accepted and still

3

holds today. After his move to the Staff Ranger position, his law enforcement commission was revoked on September 29, 2005.

Atkins filed his formal EEOC Complaint on September 6, 2005, alleging that his downgrade to a Staff Ranger position violated the Rehabilitation Act, 29 U.S.C. Section 791, *et seq*. After exhausting his administrative remedies, Plaintiff has filed a Complaint alleging discrimination based on disability, discrimination because his employer regarded him as having a disability, and discrimination based on a record of disability. In lieu of an Answer, Defendant filed a Motion to Dismiss, or, in the Alternative, Summary Judgment, attaching a multitude of documents.

*Motion to Dismiss and Summary Judgment Standards*

In considering a motion under Rule 12(b)(6), the "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004) (quoting Jones v. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)). To overcome a Rule 12(b)(6) motion, Plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); accord Ashcroft v. Iqbal, — U.S. —, 129 S. Ct. 1937, 173 L. Ed. 2d 868, 883-85 (May 18, 2009).

However, where, as here, a defendant attaches matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). Summary judgment is warranted under Rule 56(c) when evidence reveals no genuine dispute regarding any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record it believes

4

demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Id. at 324, 106 S. Ct. 2548. Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

*Analysis and Discussion*

The Rehabilitation Act prohibits the federal government and federally funded programs from discriminating against individuals on the basis of a disability and creates a private cause of action for disabled individuals, including federal employees who claim disability discrimination in connection with their employment. 29 U.S.C. §794a. The Rehabilitation Act expressly incorporates and adopts the employment discrimination standards contained in the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq*. 29 U.S.C. § 791(g).

An individual claiming discrimination under the Rehabilitation Act must show that he (1) is an "individual with a disability," (2) was "otherwise qualified" for the job in question, (3) "worked for a program or activity receiving Federal financial assistance," and (4) "was discriminated against solely by reason of . . . his disability." Aguillard v. Mukasey, 295 F. App'x 619, 622 (5th Cir. 2008) (citing Hileman v. City of Dallas, 115 F.3d 352, 353 (5th Cir. 1997)).[3] An "individual with a disability" is a person who "(1) has a physical or mental impairment which 'substantially limits one

---

[3]Prior to the 1992 amendments to the Rehabilitation Act, the statute referred to a "handicap" rather than a "disability." However, this amendment does not affect the foregoing analysis. See Soledad v. United States Dep't of Treasury, 304 F.3d 500, 504 n.5 (5th Cir. 2002).

or more of such person's major life activities,' (2) has a 'record' of such an impairment, or (3) is 'regarded' as having such an impairment." Id. (quoting 29 U.S.C. § 706(8)(B)). Atkins contends that he qualifies as an individual with a disability under the Rehabilitation Act as (1) his diabetes "substantially limits one or more of [his] major life activities," (2) he is "regarded" as having an impairment, and (3) he has a "record" of an impairment. 29 U.S.C. § 706(8)(B).

*(i) Prima Facie Case: An "individual with a disability"*

The United States Supreme Court has stated, "Merely having an impairment does not make one disabled . . . . Claimants also need to demonstrate that the impairment limits a major life activity." Toyota Motor Manu., Kentucky, Inc. v. Williams, 534 U.S. 184, 195, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002). The Court defined "major life activities" as "those activities that are of central importance to daily life." Id. at 197, 122 S. Ct. 681; see also 29 C.F.R. § 1630.2(j)(2). EEOC regulations provide a non-exclusive list of examples of "major life activities," including such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2. One "substantially limited" in a major life activity is

>   (i) unable to perform a major life activity that the average person in the general population can perform; or
>   (ii) significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

Id. With respect to whether Atkins is actually disabled, the analysis of whether a plaintiff's claimed impairment interferes with a major life activity in such substantial way as to constitute a disability requires an individualized inquiry. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S. Ct.

2139, 144 L. Ed. 2d 450 (1999). Indeed, "a plaintiff must prove a substantial limit with specific evidence that *his particular* impairment substantially limits *his particular* major life activity." Waldrip v. Gen. Elec. Co., 325 F.3d 652, 656 (5th Cir. 2003).

Atkins claims the major life activities that his diabetes affects are eating, caring for himself, and metabolizing food. Atkins declared that because of his diabetes, he must perform four to five finger stick blood glucose tests every day. Depending on the blood glucose value, Atkins must take additional steps to counteract his body's lack of naturally-produced insulin. Specifically, Atkins must either inject more insulin or consume a carbohydrate accordingly. Atkins notes that these limitations are twenty-four hours a day, seven days a week. Atkins also attests that if his blood glucose level is too high, he cannot eat without risking an adverse health episode. Moreover, before he eats, he must know what his blood glucose level is and be prepared to take action based on those numbers. He claims, "If I eat like average members of the population, without regard to blood glucose, I would die within days due to toxically high blood glucose levels." Based on Atkins' representations, the Court finds there is a genuine issue of material fact as to whether he is substantially limited in the major life activity of eating such that he may be disabled under the Rehabilitation Act.[4] Thus, Plaintiff has shown that a question of fact exists as to the first prong of

---

[4] The Fifth Circuit Court of Appeals has recognized that "eating is a 'major life activity.'" Waldrip, 325 F.3d at 655. Plaintiff has failed to show that he is substantially limited in caring for himself. See Williams, 534 U.S. at 201, 122 S. Ct. 681 (defining "caring for oneself" as engaging in household chores, bathing, and brushing one's teeth); Equal Employment Opportunity Comm. v. Chevron Phillips Chem. Co., L.P., 2009 U.S. App. LEXIS 12148, * 29 (5th Cir. June 5, 2009) (caring for oneself involves showering, cooking, shopping for food, zipping up own clothes, and using the bathroom). The Court does not have to reach the question of whether metabolizing food is a major life activity as Plaintiff has adequately shown a genuine issue of material fact as to whether his diabetes affects "*one or more* of a person's major life activities." 29 U.S.C. § 706(8)(B) (emphasis added).

his prima facie case under Rule 56.

*(ii) Qualification Standard*

The Rehabilitation Act and the ADA prohibit an employer from applying a qualification standard that screens out or tends to screen out disabled persons. See 42 U.S.C. § 12112(b)(6). But these laws also afford an employer an affirmative business-necessity defense to claims challenging the application of an otherwise problematic standard. See 42 U.S.C. § 12113(a). To benefit from the affirmative defense, an employer must prove that the pertinent qualification standard is job-related and consistent with business necessity. Id. Once an employer demonstrates that the pertinent qualification standard is job-related and consistent with business necessity, the burden shifts to the plaintiff to offer a reasonable accommodation that would allow him to satisfy that standard. Moses v. Am. Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996).

The Eleventh Circuit has explained that "[j]ob relatedness is used in analyzing questions or subject matter contained in a test or criteria used by an employer in making hiring or promotions decisions." Allmond v. Akal Secur., Inc., 558 F.3d 1312, 1317 (11th Cir. 2009) (quoting Hamer v. City of Atlanta, 872 F.2d 1521, 1533 (11th Cir. 1989)); Rohr v. Salt River Project Agricultural Improvement and Power Dist., 2009 U.S. App. LEXIS 2856, *32 (9th Cir. Feb. 13, 2009). Business necessity, in contrast, "is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria in hiring or promotional decision making." Id.

The National Park Service Director's Order regarding the Medical Standards begins:

> In 1996, the [National Park] Service completed a field study of the actual work of park rangers performing primarily law enforcement duties to enable the Department of Interior to establish a medical standard for those positions. The study evaluated the work of park rangers performing law enforcement under actual conditions and

8

> circumstances and developed proposed medical standards.
>
> . . .
>
> The Standards are designed to ensure that employees performing law enforcement are physically able to perform that duty and that their performance does not constitute a threat to the health and well being of themselves, their fellow employees, and park visitors.

The Standards further explain, "The medical standards described in this section are required because of the arduous and hazardous occupational, functional and environmental requirements of the positions covered by these standards." Moreover, "[t]he job requirements for law enforcement employees of the Service are by their nature rigorous and hazardous. These job requirements are performed under variable and unpredictable working conditions."

Thus, NPS studied the law enforcement Park Ranger position to determine the actual job duties and requirements. Those duties were deemed to be arduous and hazardous based on the actual day-to-day physical and mental demands of the position. Atkins acknowledged the arduous and hazardous nature of his position as a Law Enforcement Park Ranger. In describing his job duties, Atkins stated that his primary duty was law enforcement, which entailed patrolling the park by foot or vehicle, making arrests, issuing tickets, handling incidents, being a First Responder to motor vehicle accidents, and providing emergency medical services. Law Enforcement Park Ranger job duties typically involve the use of a government-provided patrol vehicle and service weapon.

The National Park Service's insulin dependent diabetes mellitus prohibition constitutes a qualification standard, as it is a medical requirement which must be satisfied to be a law enforcement Park Ranger. The Fifth Circuit has approved the NPS Medical Standards, holding, "the NPS requirements are reasonable and appropriate because Law Enforcement Park Rangers are subject to

9

physical demands that might not be applicable to other NPS employment positions." Detterline v. Salazar, 320 F. App'x 853, 858 (5th Cir. 2009). Moreover, persons with diabetes have been lawfully excluded from occupations in the transportation industries because of the potential impact on safety. Myers v. Hose, 50 F.3d 278, 282 (4th Cir. 1995); Chandler v.City of Dallas, 2 F.3d 1385, 1395 (5th Cir. 1993); Amariglio v. Nat'l Rail. Pass. Corp., 941 F. Supp. 173 (D.D.C. 1996). Persons with diabetes have also been lawfully excluded in the law enforcement area because of the concerns inherent in uncontrolled blood glucose levels. Siefken v. Village of Arlington Heights, 65 F.3d 664, 667 (7th Cir. 1995); Davis v. Meese, 865 F.2d 592 (3d Cir. 1989).

The Defendant contends that the ban on insulin-dependent diabetics in law enforcement positions is necessary due to the risks of hypoglycemic episodes in those individuals. The Medical Standards explicitly except persons having insulin dependent diabetes mellitus as being qualified for law enforcement duty on the following basis:

> Any excess or deficiency in hormonal production can produce metabolic disturbances affecting weight, stress adaptation, energy production, and a variety of symptoms or pathology such as elevated blood pressure, weakness, fatigue and collapse. Any condition affecting normal hormonal/metabolic functioning and response that is likely to adversely affect safe and efficient job performance is generally disqualifying. Cases will be reviewed on a case-by-case basis.

Moreover, the Medical Standards Program Manager noted:

> Hypoglycemia [(low blood glucose levels)] can affect attention, concentration, thinking, judgment, decision-making, reaction time and hand-eye coordination, along with causing irritability, confusion and rapid changes in the level of consciousness. . . . The risk of hypoglycemia is higher for individuals who use insulin, especially "intensive insulin therapy", such as an insulin pump. The major job related factor that increases the risk of hypoglycemia for police officers is disruption of meals. The duties of an NPS/LEO are by their nature arduous and hazardous, and are performed under variable and unpredictable working conditions to include unplanned

10

mealtimes, possibility of missed meals, potential for hypoglycemia.

Atkins testified that he missed no work and was not adversely affected by his low blood glucose. Dr. Larry Saladino, medical advisor to the MRB, expressed that after twenty years, some diabetics lose the ability to feel an oncoming hypoglycemic episode, making the chance for such an event more likely. Phil Spottswood, Program Manager for the Federal Law Enforcement Medical Programs, explained during Atkins' appeal hearing why his work history did not control his particular situation:

> . . . the absence of documented real-life situations regarding low blood sugar levels does not minimize safety risks and certainly doesn't minimize the concerns that the National Park Service has with regards to your ability to perform the full range of law-enforcement duties safely and efficiently. . . .
>
> One of the concerns is that you've got to be able to react and respond appropriately in time-sensitive situations, and it requires the ability to use good judgment. Even though you've got rescue meds, always remember that there is a lag time between the time you take a particular rescue medication and the time for that to act on your system. So in essence, if there was a critical situation that required your involvement and you had low blood-sugar and you took a candy bar, it really wouldn't be of any value. You'd pretty much be incapacitated if there was a significant issue.

Thus, this standard was not created arbitrarily, but rather was based upon evidence of a safety risk posed by hypoglycemia in insulin dependent diabetics, a risk which prevents the effective functioning of a law enforcement Park Ranger. Plaintiff has not argued that a twenty-year insulin dependent diabetic poses little risk of a hypoglycemic episode. Rather, Plaintiff argues that he has never had a severe hypoglycemic event at work. However, the law does not require NPS to put the lives of Atkins, his fellow Park Rangers, and the citizens they serve at risk by taking the chance that he will not experience a hypoglycemic episode on the job. See Leverett v. City of Indianapolis, 51 F. Supp. 2d 949, 958 (S.D. Ind. 1999) (noting that the "lack of a precise or universally perfect fit

between a job requirement and actual safe and effective performance is not fatal to a claim of job-relatedness, particularly when the public health and safety are at stake.").

The Court finds that Defendant has provided sufficient evidence that its Medical Standards medically disqualifying those with uncontrolled insulin-dependent diabetes are job-related and consistent with business necessity. Plaintiff has failed to offer any reasonable accommodation that would allow him to comply with the Medical Standards. Therefore, Defendant's affirmative business-necessity defense bars Atkins' claims in full. Summary judgment is therefore appropriate.

SO ORDERED, this the  5th  day of October, 2010.

                                             **/s/ Sharion Aycock**
                                             **U.S. DISTRICT JUDGE**