United States Court of Appeals
Fifth Circuit

# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

**F I L E D**

December 12, 2011

Lyle W. Cayce
Clerk

No. 10-60940

D.C. Docket No. 1:10-CV-40

DAVID A. ATKINS,

      Plaintiff - Appellant

v.

KEN SALAZAR, SECRETARY, DEPARTMENT OF THE INTERIOR,

      Defendant - Appellee

Appeal from the United States District Court for the
Northern District of Mississippi, Aberdeen

Before KING, GARZA, and GRAVES, Circuit Judges.

## J U D G M E N T

    This cause was considered on the record on appeal and was argued by counsel.

    It is ordered and adjudged that the judgment of the District Court is affirmed.

    IT IS FURTHER ORDERED that plaintiff-appellant pay to defendant-appellee the costs on appeal to be taxed by the Clerk of this Court.

ISSUED AS MANDATE: 0 3 FEB 2012

FILED

FEB 1 0 2012

DAVID CREWS, CLERK
BY_____
             Deputy

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _____
            Deputy

New Orleans, Louisiana   0 3 FEB 2012

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 12, 2011

No. 10-60940

Lyle W. Cayce
Clerk

DAVID A. ATKINS,

Plaintiff – Appellant

v.

KEN SALAZAR, SECRETARY, DEPARTMENT OF THE INTERIOR,

Defendant – Appellee

Appeal from the United States District Court
for the Northern District of Mississippi
USDC 1:10-CV-40

Before KING, GARZA, and GRAVES, Circuit Judges.

PER CURIAM:[*]

Plaintiff–Appellant David Atkins, a law enforcement park ranger, was transferred to a staff ranger position based on the conclusion of a medical review board constituted by the National Park Service (an agency of the Department of the Interior) that his uncontrolled diabetes could prevent him from safely performing his duties. Atkins filed suit under the Rehabilitation Act, claiming that his transfer amounted to discrimination on the basis of his alleged disability. The litigation focused on Atkins's challenge to the Department of the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-60940

Interior's affirmative defense that Atkins's transfer was job-related and consistent with business necessity. The district court granted summary judgment for the Department of the Interior, and Atkins appeals. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

*A. Atkins's Transfer*

In 1984, Plaintiff–Appellant David Atkins ("Atkins") began employment at the National Park Service ("NPS"), an agency of the Department of the Interior ("Interior"), as a law enforcement park ranger ("park ranger"). Atkins was diagnosed with Type 1 diabetes in 1986.

In March 1999, Interior promulgated new medical qualification standards (the "Standards") for park rangers. The Standards were created pursuant to 5 C.F.R. pt. 339, entitled "Medical Qualification Determinations," which was promulgated, after a notice-and-comment process, in 1989.[1] This regulation provides that executive agencies may establish medical standards for government-wide occupations. "Such standards must be justified on the basis that the duties of [a covered] position are arduous or hazardous, or require a certain level of health status or fitness because the nature of the position[] involve a high degree of responsibility toward the public or sensitive national security concerns." 5 C.F.R. § 339.202. The regulation further requires that "[t]he rationale for establishing the standard must be documented. Standards established by . . . an agency must be:

(a) Established by written directive and uniformly applied,

_____

[1] This regulation was promulgated pursuant to 5 U.S.C. § 3301, which provides that the President may:
>(1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service;
>(2) ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment sought; and
>(3) appoint and prescribe the duties of individuals to make inquiries for the purpose of this section.

2

No. 10-60940

(b) Directly related to the actual requirements of the position."

*Id.*

Agencies are, therefore, "authorize[d] to establish physical requirements for individual positions . . . when such requirements are considered essential for successful job performance. The requirements must be clearly supported by the actual duties of the position." 5 C.F.R. § 339.203. Similarly, "[a]gencies may establish periodic [medical] examination . . . programs by written policies or directives to safeguard the health of employees whose work may subject them or others to significant health or safety risks due to occupational or environmental exposure or demands." 5 C.F.R. § 339.205.[2] Again, "[t]he need for

---

[2] The regulations explain that

[a]n acceptable diagnosis [under the relevant medical standards] must include the following information, or parts identified by the agency as necessary and relevant:

. . .

(e) An explanation of the impact of the medical condition on overall health and activities, including the basis for any conclusion that restrictions or accommodations are or are not warranted, and where they are warranted, an explanation of their therapeutic of risk [sic] avoiding value;

(f) An explanation of the medical basis for any conclusion which indicates the likelihood that the individual is or is not expected to suffer sudden or subtle incapacitation by carrying out, with or without accommodation, the tasks or duties of a specific position;

(g) Narrative explanation of the medical basis for any conclusion that the medical condition has or has not become static or well stabilized and the likelihood that the individual may experience sudden or subtle incapacitation as a result of the medical condition. In this context, "static or well-stabilized medical condition" means a medical condition which is not likely to change as a consequence of the natural progression of the condition, specifically as a result of the normal aging process, or in response to the work environment or the work itself. "Subtle incapacitation" means gradual, initially imperceptible impairment of physical or mental function whether reversible or not which is likely to result in performance or conduct deficiencies. "Sudden incapacitation" means abrupt onset of loss of control of physical or mental function.

. . .

5 C.F.R. § 339.104(e)–(g).

No. 10-60940

a medical evaluation program must be clearly supported by the nature of the work." *Id.*

Following the directives of 5 C.F.R. pt. 339, NPS issued Director's Order #57: Occupational Medical Standards, Health and Fitness (the "Order") on March 1, 1999. The Order observed that a 1996 study conducted by Interior had proposed the adoption of new medical standards for park rangers. Consequently, NPS decided to "adopt appropriate medical standards . . . . [with] a specific goal [of] ensur[ing] that all employees assigned law enforcement, fire fighting, and other physically rigorous duties are able to safely perform those duties." The Order made clear that "[a]n employee who does not meet the medical standards established for such work may not perform law enforcement or fire fighting work . . . unless the Medical Standards Board approves a request for reasonable accommodation." Following the issuance of the Order, NPS issued the Standards.

The Standards themselves cover a range of physiological requirements and include a nonexhaustive list of "medical conditions and/or physical impairments that may be disqualifying." The Standards specifically provide that "[i]ndividual assessments will be made on a case-by-case basis to determine an individual's ability to meet the performance related requirements covered by these standards." The relevant Standard for the instant case is the "Endocrine and Metabolic Systems Standard," which deals with "excess[es] or deficienc[ies] in hormonal production [that] can produce metabolic disturbances affecting weight, stress adaptation, energy production, and a variety of symptoms or pathology such as elevated blood pressure, weakness, fatigue[,] and collapse." Under this Standard, "[a]ny condition affecting normal hormonal/metabolic functioning and response that is likely to adversely affect safe and efficient job performance is

No. 10-60940

generally disqualifying." Among the listed "conditions which may result in disqualification" is "insulin dependent diabetes mellitus," which Atkins has.

Pursuant to this Standard, a medical review of Atkins was conducted on June 27, 2000. Following the review, on July 29, 2000, Atkins was found not to be medically qualified to serve as a park ranger due to his poor vision, his history of asthma, and his diabetic condition.[3] Atkins appealed this decision, and on July 31, 2002, NPS's Medical Review Board ("MRB") granted him a medical waiver, since his "diabetic condition . . . [was] becoming well controlled." The waiver, however, also established several "reasonable accommodations" that Atkins would have to meet, including HA1C testing[4] at intervals recommended by Atkins's physician, more frequent blood testing while on duty, an exercise program, and the use of an insulin pump. A subsequent 2003 medical review found that Atkins was still not medically fit for his job due to his poor eyesight and diabetes, but the MRB granted him a second waiver on June 30, 2003, subject to approximately the same conditions as the first waiver. Atkins was medically reviewed again in 2005 and was found once again not to be medically qualified to serve as a park ranger and was placed on light duty status.[5]

In placing Atkins on light duty, the MRB explained to Atkins that he was not in compliance with the requirements of his previous waiver. In particular, the MRB observed, the examining physician had reported that Atkins's most recent HA1C test showed an elevated level of 9.4%, meaning that Atkins's diabetes did "not appear to be well controlled." The MRB further observed that

---

[3] Neither Atkins's vision nor asthma are at issue in the instant suit.

[4] "HA1C" testing—also called "A1C" testing and "A1c" testing—refers to a blood test that tracks the amount of glucose in blood over a two to three month period. The test is often used to measure diabetics' success at controlling blood-glucose levels over a period of time.

[5] Atkins would later describe his duties in this time as "mainly sitting in the office doing dispatch work and working on a patrol car. . . . [and not] doing any shift work, any night work, anything like that."

5

No. 10-60940

Atkins was also at risk for hypoglycemia, which is a state of lowered glucose levels that is capable of "affect[ing] attention, concentration, thinking, judgment, decision-making, reaction time[,] and hand-eye coordination, along with causing irritability, confusion[,] and rapid changes in [an individual's] level of consciousness." In particular, the MRB noted that "the risk of hypoglycemia is higher for individuals who use insulin, especially . . . an insulin pump." For park rangers, with their "arduous and hazardous" duties, often "performed under variable and unpredictable working conditions . . . includ[ing] unplanned mealtimes [and the] possibility of missed meals," there is "potential for hypoglycemia."[6]

Atkins appeared before the MRB to appeal the denial of his waiver. While the MRB recognized that Atkins had performed his duties without incident, one MRB member summarized NPS's concerns as follows:

> [T]he absence of documented real-life situations regarding low blood-sugar levels does not minimize safety risks and certainly doesn't minimize the concerns that the [NPS] has with regards to your ability to perform the full range of law-enforcement duties safely and efficiently. . . . [T]he question is whether or not [your blood-sugar fluctuations are] prima facie evidence that your condition is not static and stabilized. And right now, if you look at our regulations, your conditions, your condition is not static or stabilized.

Atkins admitted, in response, that the nature of his work prevented him from eating regularly or healthily: "[U]nfortunately doing what a lot of law-enforcement people do . . . our diet's not exactly the greatest thing in the world,

---

[6] Atkins himself recognizes that his duties as a law enforcement park ranger involved varied and arduous physical activities: "Patrolling the park by foot or vehicle[;] . . . ma[king] arrests, issu[ing] tickets, . . . handl[ing] all incidents given to [him;] . . . handl[ing] Emergency Medical Services [as a] First Responder on numerous incidents including numerous motor vehicle accidents[; and] . . . [working] as a wild land firefighter . . . ." Atkins also recognized that he often carried out his work alone, stating that "[a]s far as rangers go, sometimes there will be three others on, sometimes you'll be the only one. . . . [S]ometimes we ride together and a lot of times we're in cars by ourselves."

6

because if you're on patrol and you're the only one working, you can't exactly go someplace and have a decent meal. So you run through a fast-food place."

The MRB's physician remarked that Atkins's blood sugar fluctuated wildly: "[B]etween March 14th and April 13, there were seven [on-the-job] episodes where your blood sugar was below 50[mg/dl][7] in that just about one-month period, seven times. . . . The mid morning [reading] varies from 40[mg/dl] to 232[mg/dl]. I'll just read some of them: 132, 105, 232, 142, 84, 204, 40, 124, 77. That's a lot of variability in a short span of time." Another MRB member noted that "[t]here has to be some point in time when those low blood-sugar levels become fewer and fewer."

Of particular concern to the MRB was that Atkins might be unable to feel when his blood-glucose levels were perilously low:

> DR. SALADINO: So you do feel it when you're 42[mg/dl] or 47[mg/dl] or . . .
> MR. ATKINS: Well, yeah, you can feel your system. I mean, like I said, you start to get a little shaking, you'll start to maybe just feel – I don't know how to explain it all together.
> DR. SALADINO: Did you know that sometimes diabetics lose that feeling after 20 years? They stop feeling the lows until they get like very low?
> . . .
> DR. SALADINO: That's what I'm worried about, that maybe you're not feeling these lows. Feeling twitchy; I don't know.

The MRB's concern was clear: Atkins might not sense the onset of an incapacitating hypoglycemic event and, therefore, fail to take appropriate action.

---

[7] The measurement "mg/dl" represents the number of milligrams per deciliter of glucose in the blood. This is another measure for variations in a diabetic's blood-glucose levels. The United States Department of Health and Human Services has indicated that a blood-glucose measurement below 70 mg/dl is a strong indicator of a hypoglycemia. *See* U.S. DEPT. HEALTH & HUMAN SERVS., NATIONAL DIABETES INFORMATION CLEARINGHOUSE (NDIC) – HYPOGLYCEMIA, http://diabetes.niddk.nih.gov/dm/pubs/hypoglycemia/ ("When people think their blood glucose is too low, they should check the blood glucose level of a blood sample using a meter. If the level is below 70 mg/dl, . . . [a] quick-fix food[] should be consumed right away to raise blood glucose . . . .").

No. 10-60940

As the MRB explained, in such an event, the risks to the public, other NPS employees, and Atkins himself could be serious:

> One of the concerns [that NPS has with diabetic law enforcement park rangers] is that you've got to be able to react and respond appropriately in time-sensitive situations, and it requires the ability to use good judgment. Even though you've got rescue meds, always remember that there is a lag time between the time you take your particular rescue medication and the time for that to act on your system. So in essence, if there was a critical situation that required your involvement and you had low blood-sugar and you took a candy bar, it really wouldn't be of any value. You'd pretty much be incapacitated if there was a significant issue.

Following this hearing, on August 12, 2005, the MRB informed Atkins that he would not be granted a third waiver.[8] The MRB based its decision on several factors:

> 1.    That Atkins's "diabetic condition . . . [wa]s not well controlled."
> 2.    That Atkins "had several incidents of hypoglycemia," including seven episodes from March 14, 2005, to April 13, 2005, and eleven episodes from January 22, 2005, to February 21, 2005.
> 3.    That despite close monitoring by his personal physician and the use of an insulin pump, Atkins's "diabetes [was] not static and stable as outlined in 5 CFR [Part] 339, Medical Qualification Determinations."[9]

---

[8] In making its determination, the MRB considered "[Atkins's] blood glucose logs over the last year; one exercise log; medical reports from [Atkins's physician]; [HA1C] lab results; . . . the specific job requirements and environmental conditions of [Atkins's] position at the time of the medical review; documentation submitted by [Atkins] to include [a physical fitness exam]; [Atkins's] testimony to the MRB; written documentation from [Atkins's] supervisor and others on [Atkins'] behalf; the waiver granted to [Atkins] on July, 2002; and the [MRB]'s knowledge of the duties of a Park Ranger."

[9] The terms "static" and "stable" have specific meanings:

> In this context, "static or well-stabilized medical condition" means a medical condition which is not likely to change as a consequence of the natural progression of the condition, specifically as a result of the normal aging process, or in response to the work environment or the work itself.

8

No. 10-60940

4.   That Atkins "ha[d] not been diligent in monitoring [his] blood sugar levels . . . as required by [his] initial waiver."

5.   That Atkins's "blood sugar fluctuations [were] largely due to [his] failure to maintain a proper diet and nutrition as required to control [his] diabetes," and that while "[Atkins's personal physician had] hoped to stabilize [his HA1C levels at] 'the American Diabetes Association recommended goal for this value [of] less than or equal to 7.0[%] and th[at this] w[ould] be [her] personal goal for [Atkins's] level of control,'" "most of [Atkins's HA1C] levels ha[d] consistently remained above 8.0[%] and as high as 10.2[%], which demonstrate[d] [that Atkins] ha[d] not controlled [his] diabetes."[10]

6.   That Atkins had failed to submit exercise logs as required by his initial waiver.

7.   That Atkins "ha[d] not provided documentation on a quarterly basis . . . that [his] diabetic condition [was] continuing to be controlled through use of the insulin pump on a quarterly basis as required by [his] initial waiver."

Following the MRB's determination, NPS revoked Atkins's law enforcement commission on September 6, 2005, and on March 20, 2006, offered him a staff ranger position (a non-law enforcement position) at the same pay grade and duty location. Atkins accepted that offer and continues to hold this position today.

Atkins filed a discrimination complaint challenging his transfer to staff ranger with Interior's Equal Employment Office on October 18, 2005, alleging that the NPS wrongly removed him from his position because he was an insulin dependant diabetic. Following a hearing, the Administrative Law Judge decided that Atkins had not been discriminated against, and on July 2, 2007, Interior issued a Final Agency Decision affirming the Administrative Law Judge's findings. *Atkins v. Kempthorne*, 353 F. App'x 934, 935–36 (5th Cir. 2009). Atkins

---

5 C.F.R. § 339.104(g).

[10] As Interior explained in its appellate brief, "[H]A1C readings were the best available objective evidence to determine Atkins'[s] blood sugar levels and to determine whether or not his diabetes was under control."

9

No. 10-60940

appealed Interior's decision to the Equal Employment Opportunity Commission on August 6, 2007. After initially failing to properly exhaust his administrative remedies, see *id.* at 936, Atkins later properly filed a discrimination suit against Interior, in the District Court for the Northern District of Mississippi on February 22, 2010. This is the case we consider.

*B. The Present Case*

Atkins sued Interior under the Rehabilitation Act, 29 U.S.C. § 791. The Rehabilitation Act itself incorporates the standards of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 *et seq.*, ("ADA") for determining whether there has been impermissible "nonaffirmative action employment discrimination." *See* 29 U.S.C. § 791(g). The ADA prohibits discrimination against "a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[11] An ADA claim has three components: "[A] plaintiff must prove that 1) he has a 'disability'; 2) he is 'qualified' for the job; and 3) an adverse employment decision was made solely because of his disability." *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir. 1996) (per curiam) (citing *Rizzo v. Children's World Learning Ctrs., Inc.*, 84 F.3d 758, 763 (5th Cir. 1996)). "An individual has a disability under the [ADA] if he or she (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment, or (3) is regarded as having such impairment." *Stewart v. City of Houston Police Dept.*, 372 F. App'x 475, 477 (5th Cir. 2010) (citations and internal footnotes omitted).

Among the various kinds of discrimination prohibited under the ADA is

---

[11] As the events at issue in this case took place from 2000 to 2005, the 2008 Amendments to the ADA are not relevant.

### No. 10-60940

using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b)(6).[12]

Atkins contended that his diabetes is a disability that "substantially limits his major life activities of eating, caring for himself[,] and metabolizing food." However, despite his disability, Atkins alleged that he is a "qualified person with a disability and has met all of the requirements of a law enforcement ranger." "NPS disqualified [him] because of a medical qualification standard that it used to declare Atkins's diabetes 'uncontrolled' and inconsistent with his law enforcement duties," and therefore his demotion was prohibited discrimination.

Atkins made two related claims in this regard. First, Atkins alleged that Interior's revocation of his law enforcement commission because of his diabetes was improper because it was "done without substantial evidence or any evidence whatsoever that would show that [Atkins] could not [meet] his essential duties [as a park ranger]." In other words, Atkins argued that Interior demoted him because "[Atkins] has diabetes and [Interior] acted on stereotype and speculation instead of [Atkins]'s abilities," an impermissible form of discrimination. Second, Atkins alleged that Interior "regarded [Atkins] as having a disability which substantially limits life activities . . . . [and] incorrectly assumed that with diabetes it was impossible for [Atkins] to perform the essential functions of a law enforcement ranger with or without reasonable accommodation." Put differently, Interior inaccurately "perceived [Atkins's] diabetes as being uncontrolled and a

---

[12] "Qualification standards means the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q).

No. 10-60940

direct threat to himself or others," due to a "qualification standard that screens out those with diabetes regardless of how qualified they are to perform the job [in question]."

In response to Atkins's complaint, Interior filed a pre-answer motion to dismiss or for summary judgment, in the alternative, with several attached documents. Interior made several counter-arguments. First, Interior argued that Atkins was not disabled because he "does not have an impairment that affects a major life activity such as performing manual tasks, walking, seeing, hearing, [etc.] . . . ." Second, Interior contended that Atkins was not perceived as disabled by NPS since "none of his supervisors regard[ed] him as disabled." Third, Interior asserted that Interior "provided legitimate[,] nondiscriminatory reasons for its actions . . . [that Atkins] cannot show . . . are pretext." Namely, NPS had a "legitimate, nondiscriminatory" interest in "the safety of the public and its workers."[13]

In his response to Interior's motion, Atkins argued that he did have a "physical impairment, diabetes, that 'substantially limits several [major] life activities, including eating for himself and metabolizing food.'" Atkins also contended that Interior had misunderstood his claim: "[T]his is *not* a burden case; Atkins's claims arise under [the Rehabilitation Act]." Accordingly, Atkins argued, NPS's "adoption of a diabetes qualification was not . . . subject to . . . *McDonnell Douglas* proof that the standards were a pretext for discrimination." Rather, "when a qualification standard screens out people who are . . . disab[led], the plain language of the ADA require[s] the defendant . . . to plead and prove as an affirmative defense that its qualification was job-related and consistent with business necessity." *See* 42 U.S.C. § 12113(a). Thus, Atkins asserted that

---

[13] While Interior does not directly cite *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the references to a "legitimate, nondiscriminatory reason" for Atkins's demotion and Atkins's inability to show a pretext for NPS's decision are part of the *McDonnell Douglas* framework for analyzing discrimination claims. *See id.* at 802–03.

No. 10-60940

Interior, by failing to understand his argument, "ha[d] not presented and argued *any evidence* relevant to the . . . issues of job relatedness and business necessity," a proper affirmative defense to a Rehabilitation Act claim. Atkins also noted that Interior's reference to Atkins's purported inability to do his job safely indirectly invoked a second affirmative defense under the ADA, that "'a[] [disabled] individual shall not pose a direct threat to the health or safety of individuals in the workplace.'" *See* 42 U.S.C. § 12113(b). Atkins concluded that because Interior had the "burden of proceeding with evidence" under these affirmative defenses and had not done so, neither dismissal of his claim nor summary judgment was proper.

Interior responded to Atkins's arguments by directly stating that Atkins was a "direct threat to himself, fellow officers, and the public." After Interior submitted this brief, Atkins requested leave to file a sur-reply since "[Interior] ha[d] improperly raised in [its] reply brief a significant new basis for summary judgment against [Atkins]: the affirmative defense that the adverse action against [Atkins] was based on Atkin's being a direct threat to himself, his co-workers and the public." The motion was granted and both Atkins and Interior exchanged further briefs which dealt with the direct threat defense and the business necessity defense to a lesser extent.

After both sides submitted these various briefs, the district court went on to consider Interior's original motion to dismiss and its attached exhibits. Following Federal Rule of Civil Procedure 12(d), the district court treated the motion to dismiss as a motion for summary judgment. *See Atkins v. Salazar*, No. 1:10CV40-SA-JAD, 2010 WL 3937960, at *3 (N.D. Miss., Oct. 5, 2010); *see also* Fed. R. Civ. P. 12(d), 56(c). The district court found that "there [wa]s a genuine issue of material fact as to whether [Atkins] is substantially limited in the major life activity of eating such that he may be disabled under the Rehabilitation Act." *Id.* at *4.

13

No. 10-60940

The district court then turned to the question of whether the NPS guidelines were "a qualification standard that screens out or tends to screen out disabled persons," noting that the ADA, and therefore the Rehabilitation Act, affords "employer[s] an affirmative business-necessity defense to claims challenging the application of an otherwise problematic standard." *Id.* at *5. Reviewing the evidence, the district court found that "[the NPS medical] standard [under which Atkins was demoted] was not created arbitrarily, but rather was based upon evidence of a safety risk posed by hypoglycemia in insulin dependent diabetics, a risk which prevents the effective functioning of a law enforcement Park Ranger." *Id.* at *7. The district court then granted summary judgment for Interior on the business necessity defense, concluding that NPS's "Medical Standards medically disqualifying those with uncontrolled insulin-dependent diabetes are job-related and consistent with [the] business necessity [defense]." *Id.* Atkins appeals the district court's grant of summary judgment.[14]

Atkins appeals the district court's grant of summary judgment to Interior on two bases. First, Atkins argues that the district court's grant of summary judgment for Interior *sua sponte* was improper because it was based on the business necessity defense that, Atkins claims, Interior failed to present evidence on or arguments for in its motion for summary judgment. Atkins argues that the district court failed to notify the parties of its decision to rely on that

---

[14] In his appellate brief, Atkins states that "some language in the district court's opinion suggests that it was also concerned with whether Mr. Atkins posed a direct threat," referencing the "direct threat" affirmative defense. In particular, Atkins points to the district court's statement that "the law does not require NPS to put the lives of Atkins, his fellow Park Rangers, and the citizens they serve at risk by taking the chance that he will not experience a hypoglycemic episode on the job." *Atkins*, 2010 WL 3937960, at *7. This language, however, is ambiguous and does not directly reference the direct threat affirmative defense. Accordingly, we do not consider the direct threat defense on appeal, concluding that the district court based its grant of summary judgment on business necessity alone.

14

No. 10-60940

defense. Second, Atkins contends that Interior's evidence in support of its motion does not support granting summary judgment on the business necessity defense.

## II. DISCUSSION

We review grants of summary judgment de novo. *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (citing *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 386 (5th Cir. 2007)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue for trial "[i]f the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party." *Kipps v. Caillier*, 197 F.3d 765, 768 (5th Cir. 1999). We consider the facts and evidence presented in the light most favorable to the non-moving party, which is Atkins in this case. *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009).

"[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). We review for harmless error a district court's improper entry of summary judgment *sua sponte* without notice. *O'Hara v. Gen. Motors Corp.*, 508 F.3d 753, 764 (5th Cir. 2007); *see also Washington v. Resolution Trust Co.*, 68 F.3d 935 (5th Cir. 1995). A district court's grant of summary judgment *sua sponte* is "considered harmless if the nonmovant has no additional evidence or if all of the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine issue of material fact." *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1398 (5th Cir. 1994) (emphasis omitted). Consequently, even if the district court wrongly granted summary judgment to Interior—that is, without notice on a basis not argued by Interior—such error may be harmless if the record is adequately developed to support a summary judgment decision.

15

No. 10-60940

## A. *The District Court's Grant of Summary Judgment* Sua Sponte

We first address Atkins's contention that the district court wrongly granted summary judgment *sua sponte* to Interior on the basis of the business necessity defense.[15] Put simply, "[s]ummary judgment is improper if '[t]here was no reason for the [nonmoving party] to suspect that the court was about to rule on the motion.'" *Resolution Trust Corp. v. Sharif-Munir-Davidson Dev. Corp.*, 992 F.2d 1398, 1402 (5th Cir. 1993) (quoting *Kibort v. Hampton*, 538 F.2d 90, 91 (5th Cir. 1976)). Under this standard, "we have vacated summary judgements [sic] and remanded for further proceedings where the district court provided no notice prior to granting summary judgment *sua sponte*, even where summary judgment may have been appropriate on the merits." *Leatherman*, 28 F.3d at 1398.[16]

---

[15] Federal Rule of Civil Procedure 56(f) was amended on April 28, 2010, with an effective date of December 1, 2010 (after the district court's decision on October 5, 2010), to provide that a district court may grant a motion for summary judgment "on grounds not raised by a party," if the court has given the parties "notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). The advisory committee notes explain that this modification "brings into Rule 56['s] text a number of related procedures that have grown up in practice." Prior to this addition, the general rule was that a district court was required to give ten days' notice prior to granting summary judgment on a basis not urged in a pending summary judgment motion. *See, e.g., Judwin Props., Inc. v. U.S. Fire Ins. Co.*, 973 F.2d 432, 436–37 (5th Cir. 1992). This previous rule was grounded in a strict reading of the text of the pre-2009 version of Federal Rule 56(c), which provided that the nonmoving party must be served with a summary judgment motion at least ten days prior to the time fixed for the hearing, so as to afford the nonmoving party "an opportunity to respond and to develop the record in opposition to requested summary judgment." *John Deere Co. v. Am. Nat'l Bank, Stafford*, 809 F.2d 1190, 1192 & n.2 (5th Cir. 1987).

[16] The impetus for the requirement of notice is that nonmovants must be "on notice to present [relevant] arguments . . . in their response[s] to [movants's] summary judgment motion[s], [otherwise] . . . the court [will] not have the benefit of the parties' arguments." *Lozano v. Ocwen Fed. Bank, FSB*, 489 F.3d 636, 641 (5th Cir. 2007). The key is that "the basis on which the motion is granted . . . [must be] raised in a manner sufficient to make the nonmoving party aware that failure to present evidence on the issue could be grounds for summary judgment." *Loughman v. Sw. Bell Tel. Co.*, 131 F.3d 140, 1997 WL 759294, at *3 (5th Cir. Oct. 28, 1997) (per curiam).

No. 10-60940

Atkins's basic argument against the district court's grant of summary judgment *sua sponte* is that Interior never argued the business necessity defense in its initial briefing in support of summary judgment. Rather, Atkins contends, Interior argued that Atkins's inability to meet the NPS's medical standards was a legitimate, nondiscriminatory reason for his dismissal under the burden-shifting standard of *McDonnell Douglas*. As Atkins argued in his response to Interior's motion for summary judgment, when "the evidence establishes that an employer openly discriminates against an individual it is not necessary to apply the mechanical formula of *McDonnell Douglas* to establish an inference of discrimination." *Rizzo*, 84 F.3d at 762 (quoting *Moore v. U.S.D.A.*, 55 F.3d 991, 995 (5th Cir. 1995)); *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.").[17] Since Interior provided no other arguments in support of its position, Atkins concludes that the district court incorrectly granted summary judgment *sua sponte* without notice on a legal basis and facts different from those argued by Interior, effectively preventing him from addressing the business necessity defense.

Atkins's argument is unavailing. First, while Interior recognizes on appeal that it failed to raise the affirmative defense of business necessity in its opening brief, Atkins *himself* raised the business necessity defense in his summary judgment response brief:

> [T]he defendant's adoption of a diabetes qualification standard was not a business decision entitled to the Court's deference subject to

---

[17] We observe that Atkins's argument in this regard is mistaken. Interior initially defended by arguing that Atkins was not disabled because of his diabetes. Accordingly, under the *McDonnell Douglas* framework, there was no direct evidence that Atkins was actually dismissed because of a disability. Assuming *arguendo* that Atkins was able to make out a *prima facie* case of discrimination, Interior's burden in response would be "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.

17

No. 10-60940

> Atkins's *McDonnell Douglas* proof that the standards were a pretext for discrimination. On the contrary, whenever a qualification standard screens out people who are or tend to have a disability, the plain language of the ADA requires the defendant (if it seeks to avoid liability) to plead and prove, as an affirmative defense, that its qualification standard was job-related and consistent with business necessity.

In that brief, Atkins further explained that "Interior ha[d] not presented and argued any evidence relevant to the . . . issues of job relatedness and business necessity." Atkins went on to discuss the business necessity defense for several pages. He concluded that if "NPS chooses to defend this case on the basis of business necessity it has the burden of proceeding with evidence, not Atkins." All this suggests that Atkins was aware of the business necessity defense and argued against it despite Interior's failure to raise the defense in its opening brief.

Moreover, Interior made repeated reference to facts relevant to the business necessity defense in its opening brief. For example, Interior explained that NPS's "legitimate, nondiscriminatory reason" for requiring medical standards and demoting Atkins "is the safety of the public and its workers. By its very nature, law enforcement work is unpredictable and sometimes dangerous. Any condition that can quickly render a law enforcement officer confused or unconscious puts that officer, fellow officers, and the public in danger." Interior further argued that because "[Atkins]'s uncontrolled diabetes [could] affect attention, concentration, thinking, judgment, decision making, reaction time, hand-eye coordination, cause confusion, irritability, and rapid changes in level of consciousness, he clearly posed a safety threat in a potentially arduous and dangerous law enforcement assignment." Thus, Interior asserted, NPS's demotion of Atkins was a "good faith effort[] to follow their medical standards that applied to all Park Rangers in law enforcement positions with arduous duties," and these standards were "implemented to protect employees,

No. 10-60940

[Atkins]'s co-workers, the general public and [Atkins] himself." Such facts, as well as any other evidence in the record, could be considered by the district court when making its summary judgment determination. *See United States v. Houston Pipeline Co.*, 37 F.3d 224, 227 ("[T]he district judge is not compelled to limit the basis for summary judgment to those facts listed in the motion for summary judgment.") (quoting *Daniels v. Morris*, 746 F.2d 271, 276 (5th Cir. 1984)); *see also Cripe*, 261 F.3d at 886 n.9 ("Although the [defendant in this ADA suit] has mislabeled its argument and identified the wrong standard, such error does not cause us to hold that it waived the 'business necessity' defense. The [defendant] argued the relevant facts before the district court; that sufficiently put the plaintiffs and the court on notice of the actual issue the defendant should have specified.").

Given that Interior raised the business necessity defense in its reply brief to Atkins's summary judgment response brief, there may be concerns that Atkins did not have the opportunity to present either evidence or arguments in response to Interior's argument—that Interior would effectively have the final word on the business necessity defense. *See Loughman*, 1997 WL 759294, at *3–4 (reversing *sua sponte* grant of summary judgment on grounds that plaintiff failed to show an adverse employment action under the ADA when defendant argued in its summary judgment brief that plaintiff was not a "qualified individual with a disability" and raised the failure-of-proof argument only its reply brief).[18] The concern is inapposite in this case. Atkins filed a sur-reply in

---

[18] *Cf. O'Hara v. Gen. Motors Corp.*, 508 F.3d 753, 763–64 (5th Cir. 2007) ("[W]e note that GM [General Motors] did not move for summary judgment on either [of two of the O'Haras'] claims. The O'Haras argue that the district court erred by granting summary judgment on these claims *sua sponte* without giving them . . . notice . . . . We reject this argument because this Circuit recognizes a harmless error exception to the ten day notice rule. . . . Any error by the district court in considering the O'Haras' additional claims on summary judgment was harmless. The O'Haras placed these claims at issue by raising them in their January 2006 reply brief to GM's motion for summary judgment, to which they attached a 500-page appendix. They re-asserted these claims in their sur-reply brief in March

19

No. 10-60940

which he reiterated that "NPS could have tried to mount a defense against [Atkins's] § 12112(b)(6) claim with evidence of job relatedness and business necessity under § 12113(a) . . . but NPS did not."

In sum, Atkins raised the business necessity himself in his reply brief and later elaborated upon it in his sur-reply. Whether or not he had formal notice from the district court, Atkins was aware that the defense was at play and had a full opportunity to argue against it and present whatever relevant evidence he had. Notice from the district court that it intended to rely on the affirmative defenses would have made no difference to Atkins's briefing and so the lack of notice caused Atkins no harm. Moreover, a *sua sponte* grant of summary judgment without notice is proper "if all of the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine issue of material fact," *Leatherman*, 28 F.3d at 1398. As we discuss in the next section, we also hold that Interior was able to establish the business necessity defense. We, therefore, hold that the district court did not err in considering the business necessity defense in spite of its lack of notice to the parties when granting summary judgment and any error it may have made was harmless.

## B. The Business Necessity Defense

We now arrive at the second issue, whether the district court's decision to grant summary judgment on the business necessity defense was correct. We hold that the district court's grant of summary judgment in favor of Interior on the basis of the business necessity defense was correct.

Section 12112(b)(6) of the ADA creates an affirmative defense for qualification standards shown to be "job-related for the position in question and

---

2006, which was filed with a 400-page appendix. Under these circumstances, the O'Haras were afforded an adequate opportunity to present the evidence supporting their claims and . . . additional . . . notice would not have served any valid purpose.")

20

No. 10-60940

[] consistent with business necessity." The ADA further explains this defense as follows:

> It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

42 U.S.C. § 12113(a); *cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78 (2002) (explaining that sections 12112(b)(6) and 12113 create an affirmative defense for standards shown to be job-related for the position in question and consistent with business necessity). "Once an employee shows that a qualification standard tends to screen out an individual with a disability, the employer shoulders the burden of proving that the challenged standard is job-related and consistent with business necessity." *Rohr v. Salt River Project Agric. Imp. and Power Dist.*, 555 F.3d 850, 862 (9th Cir. 2009); *cf. Rizzo*, 213 F.3d at 218 ("[Under the ADA,] it is the employee's burden to prove that he is a qualified individual with a disability . . . , and it is the employer's burden to establish [an affirmative defense].").

To show a business necessity defense, a defendant must prove by a preponderance of the evidence that its qualification standards are: (1) uniformly applied; (2) job-related for the position in question; (3) consistent with business necessity; and (4) cannot be met by a person with plaintiff's disability even with a reasonable accommodation. *See, e.g.*, Fifth Circuit Pattern Jury Instructions 11.7.4. For a qualification to be "job-related," "the employer must demonstrate that the qualification standard is necessary and related to 'the specific skills and physical requirements of the sought-after position.'" *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001) (quoting *Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir.1999)). Similarly, for a qualification standard to be "consistent with

21

No. 10-60940

business necessity," the employer must show that it "substantially promote[s]" the business's needs. *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 996 (9th Cir. 2007) (en banc) (quoting *Cripe*, 261 F.3d at 890). We have stated, concerning safety-based qualification standards, that

> [i]n evaluating whether the risks addressed by a safety-based qualification standard constitute a business necessity, the court should take into account the magnitude of possible harm as well as the probability of occurrence. The acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example. In short, the probability of the occurrence is discounted by the magnitude of its consequences.

*E.E.O.C. v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000).

The record before us strongly supports a finding of business necessity on the part of Interior. The NPS Standards are clearly job-related for a park ranger. *Detterline v. Salazar*, 320 F. App'x 853, 858 (10th Cir. 2009) (noting that "the NPS requirements are reasonable and appropriate because Law Enforcement Park Rangers are subject to physical demands that might not be applicable to other NPS employment positions"). The Standards "are designed to ensure that employees performing law enforcement are *physically able* to perform that duty and that their performance does not constitute a threat to the health and well being of themselves, their fellow employees, and park visitors." (emphasis added). Atkins himself acknowledged that he was responsible for a range of physically challenging and often isolated activities: "Patrolling the park by foot or vehicle[,] . . . ma[king] arrests, issu[ing] tickets, . . . handl[ing] all incidents given to [him,] . . . handl[ing] Emergency Medical Services [as a] First Responder on numerous incidents including numerous motor vehicle accidents[, and] . . . [working] as a wild land firefighter . . . ."

The specific Standard under which Atkins was transferred is congruent with NPS's legitimate concern with ensuring the safety of the public and its

22

No. 10-60940

employees, focusing on diabetes's propensity to "produce metabolic disturbances affecting weight, stress adaptation, energy production, and a variety of symptoms or pathology such as elevated blood pressure, weakness, fatigue and collapse," all impediments to safely performing the work of a park ranger. It is clear, then, that the Standard's focus on the physical consequences of uncontrolled diabetes was "related to the specific skills and requirements" of being a park ranger and, therefore, job-related. *Cripe*, 261 F.3d at 890 (internal quotation marks and citation omitted).

The Standards also "substantially promote[d]" NPS's needs, "consistent with business necessity." *Bates*, 511 F.3d at 996. As noted above, the Standards are "designed to ensure that employees performing law enforcement are physically able to perform that duty and that their performance does not constitute a threat to the health and well being of themselves, their fellow employees, and park visitors." Moreover, as the MRB explained, hypoglycemic events may have serious consequences for a law enforcement officer:

> One of the concerns [that NPS has with diabetic park rangers] is that you've got to be able to react and respond appropriately in time-sensitive situations, and it requires the ability to use good judgment. Even though you've got rescue meds, always remember that there is a lag time between the time you take your particular rescue medication and the time for that to act on your system. So in essence, if there was a critical situation that required your involvement and you had low blood-sugar and you took a candy bar, it really wouldn't be of any value. You'd pretty much be incapacitated if there was a significant issue.

NPS is not required to wait until after there is an emergency to take action protective of the public and its employees.[19]

---

[19] *See, e.g.*, *Wilkerson v. Shinseki*, 606 F.3d 1256, 1264–65 (10th Cir. 2010) ("As long as the need to perform in an emergency is a realistic component of the job, the employer should be able to 'establish reasonable physical qualifications' to ensure that an emergency situation can be dealt with safely and efficiently by the employee, especially in situations . . . where the physical safety of others may be at risk.") (citing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 414

23

No. 10-60940

That Atkins did not experience an on-the-job incident is fortunate, but does not affect our conclusion. Other circuits, in the context of uncontrolled diabetes, have "recognized that where the [diabetic]'s medical condition is uncontrolled, of an unlimited duration, and capable of causing serious harm, injury may be considered likely to occur," even without evidence of prior incidents on the job. *Cf. Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 662 (7th Cir. 2005) ("[Diabetic plaintiff] argues that the fact that he worked at the plant for 10 months without experiencing an episode makes it doubtful that an injury is likely to occur. However, an employee with a health condition who has experienced no on-the-job episodes can still pose a direct threat to workplace safety."). As we noted above, "the probability of the occurrence is discounted by the magnitude of its consequences." *See Exxon Corp.*, 203 F.3d at 875. The consequences of Atkins experiencing hypoglycemia while carrying out a dangerous arrest, responding to a medical emergency, or fighting a fire are sufficiently large to justify NPS's revocation of his law enforcement condition on the basis of even a small risk of hypoglycemia.

NPS did not reach the conclusion that demoting Atkins was a business necessity haphazardly; it followed a uniform pattern application. The Standards rely on "[i]ndividualized assessments [to] be made on a case-by-case basis." This is the kind of analysis we have required in other cases: "'An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person,'" *Rodriguez v. ConAgra Grocery Pros. Co.*, 436 F.3d 468, 482 (5th Cir. 2006) (quoting *Toyota Motor Mfg. Ky. Inc. v. Williams*, 534 U.S. 184, 199 (2002)), and this assessment must be linked to the employee's "ability to perform the essential functions of [the job]." *Kapche v. City of San Antonio*, 304 F.3d 493, 499

(1979)).

24

No. 10-60940

(5th Cir. 2002).

Notably, NPS has not sought simply to exclude diabetics from serving as park rangers. *See Kapche*, 304 F.3d at 500 (holding that summary disqualification of police officer because of diabetic status was improper and that an "individualized assessment of an [applicant]'s present ability to safely perform the essential functions of [a] police officer is required"). Rather, as the Manager of NPS's Medical Standards Program explained, for park rangers, "diabetes in and of itself is not nor has it ever been considered a disqualifying condition. Indeed, several Park Rangers who are Type 1 Insulin Dependent diabetics are medically qualified to perform their law enforcement duties." Rather, the Standards are concerned with the "safety and health risks [posed by] Park Rangers whose diabetes is not controlled or unstable." Park rangers with diabetes who are medically qualified for duty have "the ability to stabilize their blood sugar at acceptable levels." Park rangers like Atkins, however, "whose particular medical conditions are not under control[,] . . . have been determined not to be medically qualified to perform law enforcement duties."

In determining, after two prior assessments, that "Atkins failed to meet the medical requirements imposed by 5 C.F.R. Part 339 on Park Rangers" in his third review, NPS relied on a wide range of medical and other data, collected over the course of a year. The MRB specifically found that Atkins had been routinely experiencing hypoglycemic events during his work as a park ranger, including seven events in one month-long period and eleven events during another. Indeed, the physician on the MRB specifically remarked that Atkins's blood-glucose levels fluctuated wildly even during shorter periods of time. The record indicates that there was a legitimate concern that Atkins might be unable to even sense the approach of a hypoglycemic episode and therefore unable to prevent it. Moreover, the actual work of a park ranger in rural Mississippi, with

25

No. 10-60940

its long hours, unpredictable schedule, and absence of suitable dietary options, left Atkins especially vulnerable to a hypoglycemic episode.

Atkins's personal efforts to control his diabetes offered little solace, either. "[Atkins's personal physician had] hoped to stabilize [his HA1C levels at] 'the American Diabetes Association recommended goal for this value [of] less than or equal to 7.0[%] and th[at this] w[ould] be [her] personal goal for [Atkins's] level of control.'" But "most of [Atkins's HA1C] levels ha[d] consistently remained above 8.0[%] and as high as 10.2[%], demonstrat[ing] [that Atkins] ha[d] not controlled [his] diabetes."

Atkins's argument that a "uniform application" demands that "[Interior] needed to come forward with . . . evidence of symptoms marking the point at which it would ordinarily determine that metabolic dysfunction was likely to have adverse effects on safety and efficiency, and evidence that [Interior] applied that cut-off point" is unpersuasive. Atkins cites no statutory, regulatory, or case authority for this proposition. Interior was allowed to make a holistic determination, based on medical evidence substantial in amount and significance, that Atkins's fluctuating blood-glucose levels posed a significant risk to the public, other NPS employees, and Atkins himself. Indeed, Atkins received, and failed, three individualized assessments consistent with Interior's regulatory requirements.

Finally, no reasonable accommodation would cure the problems posed by a park ranger with "uncontrolled" diabetes like Atkins, at least not without inflicting "undue hardship" on NPS. *See Bates*, 511 F.3d at 996–97.[20] In spite of

---

[20] The ADA states that

'reasonable accommodation' may include . . . job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

No. 10-60940

two previous waivers with specific accommodations, instructions, and benchmarks, Atkins was unable to mitigate his fluctuating blood-glucose levels. NPS was rightly concerned that there was a significant "likelihood that [Atkins might] experience sudden or subtle incapacitation as a result of [his] medical condition," indicating that his diabetic condition was neither "static or well stabilized ," 5 C.F.R. § 339.104(g), the key requirement behind his previous two waivers.

In conclusion, then, the record supports the district court's conclusion that there was no genuine issue of material fact regarding the business necessity defense and its grant of summary judgment in favor of Interior was proper.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the Department of the Interior. All pending motions are DENIED.

---

42 U.S.C. § 12111(9).

27